UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RAFAEL JUAN COLON,                          :

             Petitioner,           :           09 Civ. 5168 (LTS) (AJP)

       -against-                :           **REPORT AND RECOMMENDATION**

ROBERT ERCOLE, Superintendent,              :
Green Haven Correctional Facility,
                          :

           Respondent.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Laura Taylor Swain, United States District Judge:**


_____Pro se petitioner Rafael Juan Colon seeks a writ of habeas corpus from his April 22,

2004 conviction, after a jury trial in Supreme Court, New York County, of two counts of first degree

murder, and sentence to concurrent terms of 25 years to life imprisonment. (Dkt. No. 2: Petition

["Pet."] ¶¶ 1-5; Dkt. No. 14: State Br. at 1.)

          Colon's habeas petition asserts that: (1) he "was subjected to custodial interrogation

without <u>Miranda</u> warnings," and (2) "the trial court refused to instruct the jury that petitioner's post

<u>Miranda</u> statement should be disregarded." (Pet. ¶ 13.)

          For the reasons set forth below, Colon's habeas corpus petition should be <u>DENIED</u>.

**FACTS**

**Overview**

On April 25, 2002, paramedics found the body of 79-year-old Dolly Castano submerged in the bathtub of her apartment at 419 West 17th Street in Manhattan. The next day, after accompanying police officers to the precinct for an interview, Colon told Detective Antonio Rivera that he had had sex with Castano in her apartment. Colon was given and waived his <u>Miranda</u> rights and gave oral and written statements claiming that Castano had slipped and hit her head during consensual sex in the bathroom of her apartment. After the passage of over six hours, Colon was given and again waived his <u>Miranda</u> rights and gave a videotaped statement to an assistant district attorney, reiterating his claims that Castano's death was accidental.

While Colon was incarcerated awaiting trial, he confided in fellow inmate Eugenio Cintron that he had beaten and choked Castano to death. At trial, when Cintron entered the court room to testify, Colon yelled that he was going to kill Cintron for being a snitch.

**Evidence at the Suppression Hearing**

Colon moved to suppress his statements to the police and a hearing was held before Justice Marcy L. Kahn. (Dkt. Nos. 6 & 8: Suppression Hearing Transcript ["H."].)

### The 911 Call & Discovery of the Victim's Body

On April 25, 2002 at 5:00 p.m., an unidentified woman telephoned 911 and reported that a woman was having an asthma attack at 419 West 17th Street, Apartment 3A. (Flores: H. 274; Miller: H. 453-56.) In the background, a man (later identified as Colon) could be heard instructing the caller what to say. (Flores: H. 274.) When paramedics arrived at the apartment, they found the

lifeless body of Dolly Castano, naked from the waist down and submerged in a bathtub full of water. (Flores: H. 266-68, 314; Miller: H. 453-56; Dkt. No. 20: Colon Traverse at 3.)

At 6:00 p.m., when Detective Lucas Miller arrived at Castano's apartment, he found signs of a push-in robbery, including a set of keys on the floor by the front door. (Miller: H. 455-56, 481.) Detective Miller also saw cigarette butts in the apartment. (Miller: H. 499-500.)

At 9:00 p.m., Police Officer Anthony Flores arrived at Castano's apartment. (Flores: H. 264-66, 308-09.) Officer Flores had a "steady beat" in the Fulton Houses, the public housing development that included 419 West 17th Street, and had been called in off duty to identify Castano's body. (Flores: H. 262-64, 308-09). At 10:00 p.m., when Officer Flores was leaving the building, he encountered a group of neighborhood residents, including Colon. (Flores: H. 268-71, 316-20.) In response to a question from a woman in the crowd, Officer Flores said that Castano's body had been discovered after "someone made a 911 call." (Flores: H. 270, 318-19.) Colon asked, in Spanish, if the police "trace 911 calls?" (Flores: H. 270-73, 320; Colon Traverse at 3.) Officer Flores had heard Colon speak on "several occasions" in the past, and noted Colon's familiar and "distinctive" lisp. (Flores: H. 272-73.) Officer Flores replied, in Spanish, that "they are probably doing that right now." (Flores: H. 272-73.)

At midnight, Officer Flores went to the 10th Precinct and listened to an audiotape of the 911 call. (Flores: H. 273-76, 322-25; Miller: H. 459, 483.) Officer Flores "[i]mmediately" recognized Colon as the man directing the female caller. (Flores: H. 274-75, 324-25; Miller: H. 459, 483.)

**Colon's Apartment**

At 3:00 a.m. on April 26th, 2002, Officer Flores and Detectives Miller, Rice, Trigo, and Lozada went to Colon's apartment on the 24th floor of 419 West 17th Street. (Flores: H. 276-77, 327-29; Miller: H. 460, 465, 490; Colon Traverse at 3.) They sought to speak to Colon to learn why he had placed the 911 call and what he knew about Castano's death, not to arrest him. (Flores: H. 325-29; Miller: H. 460.)

"Several times" the officers knocked on Colon's door and "[a] few times" stated, "police." (Flores: H. 277-78, 330-33; Miller: H. 461.) Colon opened the door wearing a t-shirt and boxer shorts. (Flores: H. 278, 280, 332-33; Miller: H. 461.) Officer Flores asked Colon how he was doing, and Colon replied, "'what happened, Flores?'" (Flores: H. 334-35.) Officer Flores said that the officers "wanted to ask [Colon] a few questions" about "the lady" in Apartment 3A. (Flores: H. 279, 335; Miller: H. 462, 486.) Officer Flores said that they had already spoken to "several" people in the building and were speaking to everyone who had seen the woman the previous day. (Flores: H. 279, 334-36; Miller: H. 462-63, 486.) Officer Flores asked if Colon would mind accompanying them to the precinct. (Flores: H. 279-80, 334-35; Miller: H. 462.) Colon was "[m]atter of fact" (Miller: H. 463) and replied, "'no problem.'" (Flores: H. 280, 334.)

As Colon went to get dressed, his wife invited the officers to wait inside the apartment. (Flores: H. 280-81, 336-39; Miller: H. 463.) Detective Miller and Officer Flores entered the apartment. (Flores: H. 337-45; Miller: H. 490.)[1] Officer Flores asked Mrs. Colon if Colon had

---

[1]     Detective Miller asked Mrs. Colon if Colon smoked. (Flores: H. 343-44; Miller: H. 502-04.) (continued...)

gone to the senior center the previous afternoon,[2] she replied that Colon had been at the center and brought her back some cake before going to escort their neighbor "Yolanda" to the hospital. (Miller: H. 506-09.)

After about ten minutes, Colon came into the living room to put on his socks and shoes. (Flores: H. 281, 339-42; Miller H. 463-64, 491, 503-04.) Mrs. Colon began to cry, and Officer Flores reassured her that they just wanted to talk with Colon. (Flores: H. 343; Miller H. 509-10.) None of the officers had indicated that Colon was under arrest, and Colon was not handcuffed. (Flores: H. 281-82, 341-43.) Detectives drove Colon to the precinct and brought Colon to an interview room off of the detective squad. (Flores: H. 348-51; Miller: H. 466-67, 518; Colon Traverse at 3.) The room contained a bench, chairs, a desk and a window, and was partitioned by a one-way mirror that allowed it to be used to conduct lineups. (Flores: H. 350-51; Miller: H. 466-67.)

Meanwhile, Detectives Miller and Rice and Officer Flores spoke to Yolanda, who told them that she had gone to the hospital by herself the previous afternoon. (Miller: H. 517-18; Flores: H. 281-82.) When they returned to the precinct at around 3:30 a.m., Colon was seated alone

---

[1]    (...continued)
Mrs. Colon said that Colon smoked occasionally and brought the officers to the kitchen, where she opened a drawer to show them packages of several different brands of cigarettes. (Flores: H. 343; Miller: H. 502-05.)

[2]    By that point, the police had determined that Castano had last been seen at about 3:30 p.m. the previous afternoon leaving the Fulton Houses senior center following a luncheon in her honor. (Flores: H. 285; Miller: H. 456-58.)

and without handcuffs in the interview room with the door open.  (Flores: H. 281-83, 349,351-53;

Miller: H. 469, 518.)

**The 4:00 A.M. Interview at the Precinct**

At 4:00 a.m., Officer Flores and Detectives Miller and Rice went to the interview

room, leaving the door open as they spoke to Colon for fifteen to thirty minutes.  (Flores: H. 353-57;

Miller: H. 467-69, 518-19, 521.)  During the conversation, Officer Flores told Colon that he was not

under arrest and that he was free to leave.  (Flores: H. 293; Miller: H. 469-70.)  Colon indicated that

he understood.  (Miller: H. 470.)

Officer Flores, acting as a translator, asked Colon "what had happened."  (Flores: H.

283-84; Miller: H. 467.)  Colon indicated that he believed the police knew he had made the 911 call,

and Officer Flores acknowledged that he had heard Colon on the 911 tape.  (Flores: H. 283-86, 354-

57; Miller: H. 467-69, 519.)  Detective Miller and Officer Flores asked if Colon had been with

Castano the previous afternoon.  (Flores: H. 285, 363; Miller: H. 467-68, 487-89, 521-24.)  Colon

said that he had seen Castano at the senior center at about 9:30 a.m., but that he did not know when

she left and he had not been to her apartment that day.  (Flores: H. 283-85, 289-90; Miller: H. 467-

69, 487-89, 523-26.)  Colon said that he had heard a woman calling from her apartment window that

she was having an asthma attack.  (Flores: H. 286-90, 357; Miller: H. 524-25.)  Colon claimed that

he went to a pay-phone on the corner of either 17th or 19th Street and Ninth Avenue to purchase

lottery tickets.  (Flores: H. 288, 355-57; Miller: H. 468-69.)  There, Colon enlisted a woman to call

911 because he did not speak English and felt the 911 operator would not be able to understand him.

(Flores: H. 288; Miller: H. 468.)  When asked why he had not gone directly to Castano's aid, Colon

said that he felt the woman might have been attacked and he was afraid of being attacked. (Flores: H. 289, 358; Miller: H. 468.)

### The 6:00 A.M. Interview by Detective Kane

At 6:00 a.m., approximately ninety minutes after the first precinct conversation with Colon was concluded, Detective Harvey Kane spoke to Colon at the request of Detective Rice. (Kane: H. 532-33.) Detective Kane found Colon sitting alone in the interview room. (Kane: H. 533.) Colon was not handcuffed, the door was unguarded, and Detective Kane's understanding was that Colon was not under arrest. (Kane: H. 533-34.) When asked about the 911 call, Colon replied, primarily in English, that he had been in an "Arab bodega" at 19th Street and Ninth Avenue, when a fifteen- or sixteen-year-old girl came in and said there was a woman at 419 West 17th Street who suffered from asthma and needed help. (Kane: H. 534-35.) The girl called the police. (Kane: H. 535.) Detective Kane's conversation with Colon lasted about seven minutes. (Kane: H. 535.)

At about 6:15 a.m., after conferring with Detective Rice, Detective Kane returned to the interview room. (Kane: H. 536, 546.) Detective Kane told Colon that he was not "totally comfortable" and asked Colon to "explain his story . . . again." (Kane: H. 536-37.) Colon now said that he had been walking past 419 West 17th Street when he heard a woman call from the window of Apartment 3A that she had a heart condition and asthma and needed the police. (Kane: H. 537.) Colon walked to a bodega on the corner of 19th Street and Ninth Avenue, where he told a woman about the cry for help and the woman called the police. (Kane: H. 537.) The exchange between Colon and Detective Kane lasted less than ten minutes. (Kane: H. 538, 546-47.)

**Detective Mendez's 10:00 A.M. Interview**

At 9:00 a.m., Detectives William Mendez and Randal Roca arrived at the precinct after Detective Mendez had received a request to help with a person who "didn't speak English too much." (Mendez: H. 6-7, 67-68, 89-90, 94.) Detective Miller and other officers briefed Detective Mendez, informing him that Colon's statements were "rambling," they were "suspicious" and "they weren't understanding" Colon either because they did not speak Spanish or because Colon was "lying." (Mendez: H. 8-9, 96-101, 108-21.)

At 10:00 a.m., Detective Mendez joined Officer Flores and Colon in the interview room. (Mendez: H. 10-11.) Detective Mendez introduced himself and told Colon that he was there to "get [Colon's] story," to get "help from" Colon, and to "help" Colon. (Mendez: H. 10-11, 160-61.) While "inquisitive," Detective Mendez kept his "mannerisms" "relaxed," "civil," and "reassuring." (Mendez: H. 11.) Detective Mendez tried to make Colon comfortable by talking with him about "older guys" still being "interested in ladies"; Colon said that he was "interested in ladies" and that he took Viagra. (Mendez: H. 242-43.)

When asked about the 911 call, Colon said that he had already spoken to other officers about the call. (Mendez: H. 158-61.) Detective Mendez said that he was a detective and needed to hear Colon's account in its entirety and that Colon should be truthful. (Mendez: H. 10-12, 155-61.) Colon said that he had been in front of 419 West 17th Street when he heard a "faint" cry for help, "got nervous," went to a bodega on 19th Street where he usually bought lottery tickets, and asked an "unknown female" to call the police. (Mendez: H. 12-13, 165-66, 172-73.) After the 911 call, he went into the bodega and bought lottery tickets. (Mendez: H. 13.) Detective Mendez asked

Colon why he would walk past pay-phones on the way to 19th Street if he wanted to help the woman in distress; Colon had no answer.  (Mendez: H. 184-85.)  When asked why he had not tried to help the woman himself, Colon said that he had been afraid and did not know what to do.  (Mendez: H. 179-80.)

Colon contradicted himself a number of times.  For example, Colon first indicated that cries of distress had come from the seventh floor, then from the third floor, and finally from Apartment 3A, specifically.  (Mendez: H. 167-72.)  When asked if he had been on the third floor that day, Colon first said that he had not, but later said that he had helped a wheelchair-bound neighbor to her third-floor apartment.  (Mendez: H. 13-14, 188, 193-210.)  Colon first said that he had helped the woman at 9:00 a.m., but later said that this took place at 3:00 p.m.  (Mendez: H. 16-17, 196-210.)  Colon initially denied knowing Castano, but eventually acknowledged that he knew "Dolly" and that he had seen her at the senior center the previous afternoon.  (Mendez: H. 17, 193-210.)

During the conversation, Detective Roca walked into and out of the interview room.  (Mendez: H. 124-27, 164, 182.)  At one point, Detective Roca told Colon that the police believed Colon knew what happened to Castano and that he should tell the truth.  (Mendez: H. 126-27, 148, 171, 181-82.)  In regard to Colon's answers about the source of the distress calls and why he had walked to 19th Street to call 911, Detective Roca remarked in English to Detective Mendez "something like" Colon was "bullshitting" or that his account was "horseshit."  (Mendez: H. 171-72, 182, 186; Colon Traverse at 23.)  Detective Mendez told Colon that this was a "'serious investigation'" and that detectives were canvassing the building and looking for fingerprints.

(Mendez: H. 191-93.)  Detective Mendez observed that not everybody in the building liked Colon and that it would not "look good" if Colon was not telling the police everything.  (Mendez: H. 191-93.)

       During the interview, Colon moved around the room freely, was not handcuffed, and the door to the interview room remained open.  (Mendez: H. 7, 20-21; Flores: H. 293-94.)  Officer Flores again told Colon that he was not under arrest and that he was free to leave and Colon "said he understood, he knew because he hadn't done anything. . . ."  (Flores: H. 293-94.)  Detective Mendez likewise told Colon that he was free to leave.  (Flores: H. 293.)  Throughout the morning, Colon was given water, offered food and went to the bathroom unescorted.  (Flores: H. 294.)

### Detective Rivera, Who Knew Colon From The Neighborhood, Speaks to Colon

       At 10:30 a.m., Detective Antonio Rivera arrived at the precinct after receiving a request for a Spanish-speaking detective.  (Rivera: H. 405-07, 426.)  Detective Rivera was from the same neighborhood as Colon and knew Colon because Colon "lived above the apartment where [Rivera's] parents lived."  (Rivera: H. 409.)  At 10:45 a.m., Detective Rivera saw Colon through the open door of the interview room; Colon was alone and was not handcuffed.  (Rivera: H. 407-08, 427-28.)

       At 11:15 a.m., after being briefed on the case, Detective Rivera went into the squad room and saw Colon standing outside the interview room, having picked up a telephone to make a call.  (Rivera: H. 408-11, 426-29, 435.)  Colon referred to Detective Rivera by his nickname, "'Junior,'" and asked to speak to him.  (Rivera: H. 410, 429, 435.)  Detective Rivera and Colon went

into another room, the viewing room, where they sat with the door open. (Mendez: H. 21-22, 25; Rivera: H. 410-11, 429, 436.)

Colon told Detective Rivera that "police" were asking him about a woman found dead in his building and that he had "no knowledge" of the woman. (Rivera: H. 411-12, 429-32.) Colon asked whether Detective Rivera "knew anything about what was going on" and whether he could find out if there was "any evidence." (Rivera: H. 411, 430-32.) Detective Rivera said that he did not know the answer to Colon's questions, but urged him to tell the truth about "whatever he knew about what had happened." (Rivera: H. 411.) The conversation lasted about five minutes and, afterwards, Detective Rivera bought Colon a sandwich, a soda and water. (Rivera: H. 416, 429.)

While Detective Rivera spoke to a supervisor, Officer Flores and Detectives Mendez and Roca resumed speaking with Colon. (Mendez: H. 223-25; Rivera: H. 412.) Detective Mendez explained that they needed "the real story" from Colon and that, if something happened with the lady, Colon should tell them. (Mendez: H. 24-26, 222-25.) Colon asked about a possible sentence and whether he might receive probation. (Mendez: H. 231-32, 253-56.) Detective Mendez told Colon that such matters were "not up" to him, but rather would be decided by the "Judge and the prosecutor." (Mendez: H. 231-32.)

At 11:30 a.m., Detective Rivera entered the interview room and, as he had earlier, said that Colon should "tell the truth" about what he had "seen or heard." (Rivera: H. 412-13.) Colon "looked a little embarrassed" and asked if he could speak to Detective Rivera alone. (Rivera: H. 413.) Detective Rivera said, "'Sure,'" and Colon and Detective Rivera walked into the adjacent

viewing room. (Rivera: H. 413.) Detective Rivera's "understanding" was that Colon was not under arrest, he was not cuffed, and the police needed to ask him questions. (Rivera: H. 415.)

At 11:40 a.m., in the adjacent viewing room, without any questioning or prompting from Detective Rivera, Colon volunteered that he "had sex with the lady in the living room and in the bathroom." (Rivera: H. 413-14, 417, 436-39.) Detective Rivera stopped the conversation, again told Colon to tell the truth, and brought him back to the interview room. (Rivera: H. 413-14, 417, 437-39.) Detective Rivera told Detective Mendez what Colon had said. (Rivera: H. 416-17.)

**Colon's Mirandized Statements From 11:45 A.M. to 1:30 P.M.**

At 11:45 a.m., Detective Mendez read Miranda warnings to Colon, who nodded his head affirmatively following each warning. (Mendez: H. 26-32, 229-30; Rivera: H. 418.) Detective Mendez read the warnings a second time and, after each warning, asked Colon whether he understood that right. (Mendez: H. 28-29.) Colon responded that he understood each warning and initialed each written warning on the Miranda card. (Mendez: H. 28-32.) Colon said that he was willing to answer questions and initialed that line on the Miranda card. (Mendez: H. 31.) Colon also said that he knew about his Miranda rights because he had been arrested before. (Mendez: H. 32.)

At approximately noon, Colon expressed concern for his wife and asked if "it was possible for him to get" his blood pressure medication. (Mendez: H. 32-33, 177-79, 230-31, 257-59; Flores: H. 298-300, 371.) Colon did not express any discomfort and said that "all he needed was his medication." (Flores: H. 299.) Detective Mendez told Colon that "'we can find out'" if it is possible to get the medication. (Mendez: H. 179, 230.) Officer Flores went to Colon's apartment to get the medication, but another officer had already picked it up. (Flores: H. 300-07, 371.) Officer Flores

returned to the precinct "to make sure [Colon] had gotten it," and Colon confirmed that he had received his medication. (Flores: H. 301.) At several points while providing his oral and written statements, Colon expressed a concern about what sentence he might receive, even mentioning the death penalty. (Mendez: H. 232-40.) Colon again asked Detective Mendez if he might receive probation if he pled guilty. (Mendez: H. 231-34.) Detective Mendez replied that sentencing was not part of his job and that "the Juge and prosecutor" would decide what charges to bring. (Mendez: H. 232.)

For the next hour and a half, Colon provided an oral statement to Detective Mendez. (Mendez: H. 36-37, 53.) Colon claimed that he had had sexual relations with Castano in the past at hotels. (Mendez: H. 244.) When Detective Mendez asked about what hotels they had gone to, Colon replied that he did not "want to talk about that" and that he did not "want to talk about this anymore." (Mendez: H. 244-45.) Detective Mendez said, "'[W]ell, look, let's just figure out what it is that happened.'" (Mendez: H. 246.) Colon continued to discuss Castano's death the previous day. (Mendez: H. 246.) Detective Mendez wrote a summary of Colon's statement. (Mendez: H. 37-39, 51-52; Rivera: H. 419.) Detective Mendez read the statement back to Colon and asked whether he wished to make any changes. (Mendez: H. 42-43.) Colon indicated that everything was correct and, at 1:20 p.m., signed the statement. (Mendez: H. 38, 43; Rivera: H. 418-19.)

In his written statement, Colon said that he had had sex with Castano on a "couple of occasion[s]" and that, on April 25th, she had invited him to her apartment "to have sexual contact." (Mendez: H. 51.) Castano had gone to draw a bath and when "she was stooped over," Colon "tried to make love to her from behind." (Mendez: H. 51-52.) Castano fell and hit her head

on the bathtub. (Mendez: H. 52.) Colon "panicked" and "left to call the police." (Mendez: H. 52.) Colon said it "was an accident" and that if possible he wanted "to plead guilty for sentence of probation." (Mendez: H. 52.)

At 4:00 p.m., Detective Miller formally arrested Colon. (Miller: H. 473-74.) Colon spent the rest of the afternoon in the interview room with a police officer either in the room or near the open door. (Mendez: H. 45-46, 248.) Several times that afternoon, Colon called out to Detective Mendez through the open door of the interview room as the detective walked by and said, "'How does it look?,'" "'Remember what I said to you'" and "'Try to get a probation deal for me.'" (Mendez: H. 45-46, 247-48; Colon Traverse at 30.)

### The 8:05 P.M. Videotaped Statement to the ADA

At 8:05 p.m., Assistant District Attorneys ("ADA") Lanita Hobbs and Julie Nobel arrived at the precinct and took a videotaped statement from Colon, with Detective Mendez and an interpreter also present. (Mendez: H. 46-47; Dkt. No. 14: State Br. at 14.) Colon acknowledged that Detective Mendez had previously read him <u>Miranda</u> warnings, that Colon understood those warnings, and that he spoke "'freely'" and "'voluntarily'" with Detective Mendez. (State Br. at 14.)[3] ADA Hobbs again informed Colon of his <u>Miranda</u> rights, and Colon said that he understood those rights. (State Br. at 14.) Asked whether he was willing to waive his rights and answer questions, Colon said, "'Yes, of course.'" (<u>Id.</u>)

---

[3] The Court has not received a transcript or a copy of Colon's videotaped statement and relies on the summary in the State's brief.

Colon stated that he had a sexual relationship with Castano since the late 1980s. (State Br. at 14.) For many years, they had gone to hotels, but the previous day, Castano had invited Colon to her apartment. (Id.) Colon "'went to make love'" to Castano, but "'she slipped'" and fell against the bathtub. (Id.) Colon "'panicked,'" left the apartment, and found a "'person'" to call the police. (Id.)

At 8:38 p.m., Colon said that he did not feel well and did not want to continue. (State Br. at 15.) The interview was suspended while Colon took his blood pressure medication. (Id.) The videotape was stopped and ADAs Hobbs and Nobel and the interpreter left the room. (Mendez: H. 58; State Br. at 15.) Alone with Detective Mendez, Colon made no mention of any medical problem, but asked whether Detective Mendez thought ADA Hobbs believed him and about what kind of sentence Detective Mendez thought he would get. (Mendez: H. 58-60; State Br. at 15.)

At 9:20 p.m., the videotaped interview resumed with Colon stating that he received his medication, felt better and was willing to continue. (State Br. at 15.) Over the next 40 minutes, Colon reiterated his account of Castano's death. (Id.)

**Justice Kahn's Suppression Decision**

On December 15, 2003, Justice Kahn heard oral arguments on the suppression motion. (H. 618–769.) Colon's counsel conceded that Colon was not in custody when the police spoke to him at his apartment or during initial questioning at the precinct between roughly 4:00 a.m. and 6:30 a.m. on April 26, 2002; although the conversations took place prior to the issuance of Miranda warnings, Colon's counsel conceded that Colon's statements through 6:30 a.m. were admissible at trial. (H. 676, 682, 732-33.)

Colon's counsel argued that Colon's subsequent statements to the police should be suppressed. Specifically, Colon's counsel contended that, at about 10:00 a.m., prior to receiving Miranda warnings, Colon had come into custody while being questioned by Detective Mendez. (H. 682, 691-99.) Colon's counsel further argued that, after being informed of, and initially waiving, his Miranda rights, Colon had invoked his right to silence while being questioned by Detective Mendez between 11:45 a.m. and 1:20 p.m. (H. 699-707.) Colon's counsel argued that these alleged violations of Colon's rights tainted Colon's 8:05 p.m. videotaped statement. (H. 710-27.)

On January 30, 2004, Justice Kahn issued a one-page order denying Colon's suppression motion. (Dkt. No. 12: State Ans. App. Ex. A: 1/30/04 J. Kahn Order.) On August 6, 2004, Justice Kahn issued a 76-page decision. (State Ans. App. Ex. A: 8/6/04 J. Kahn Decision.) Justice Kahn found that the State's hearing witnesses were credible, with only "minor inconsistencies" in their testimony, and made factual findings reflecting that testimony. (8/6/04 J. Kahn Decision at 2-31.) Justice Kahn held that, as a matter of New York law, Colon bore the burden of establishing that he was in custody prior to being advised of his Miranda rights. (8/6/04 J. Kahn Decision at 38-54.) In the alternative, Justice Kahn held that, even if the State bore the burden of proof on custody, the "evidence here demonstrated beyond a reasonable doubt that [Colon] was not in custody prior to 11:45 a.m." on April 26, 2002, when Colon was informed of, and voluntarily waived, his Miranda rights. (8/6/04 J. Kahn Decision at 64 n.14.) Additionally, although during the interview between 11:45 a.m. and 1:20 p.m., Colon indicated to Detective Mendez a "desire to avoid" the "embarrassing topic" of his purported affair with Castano, this was best understood as an effort to "exclude certain areas of questions, and not as an unequivocal and unqualified invocation

of his right to remain silent." (8/6/04 J. Kahn Decision at 69-70.) In the alternative, Justice Kahn found that the break between Colon's statement to Detective Mendez culminating in his written statement at 1:20 p.m. and the 8:00 p.m. videotaped statement was "sufficiently pronounced" to insulate the latter from any taint. (8/6/04 J. Kahn Decision at 71-72.)

**The Evidence at Trial**

**The State's Case**

Dolly Castano volunteered at a senior citizen's center at 119 Ninth Avenue, between 17th and 18th Streets, in Manhattan, and was known as "the tea lady," because she served coffee and tea during the center's lunch service. (Dkt. Nos. 7, 9-11; Portelli: Tr. 1086-87; Chung: Tr. 1111-12; Cruz: Tr. 1183-84; Morales: Tr. 1347-48; Nunez: Tr. 2415-17.) Castano was a "petite" 79-year-old woman, who stood about four feet five inches tall, weighed 165 pounds, and wore eyeglasses. (Cruz: Tr. 1183-84; Morales: Tr. 1351; Flombaum: Tr. 2465-66.)

On April 25, 2002, the center had a ceremony to honor volunteers, including Castano. (Portelli: Tr. 1090-91.) The ceremony was attended by other volunteers, including Elayne Nunez and Mercedes Morales, and Castano's friends Katherine Chung and Aida Cruz, who were regular diners at the center. (Chung: Tr. 1111-13, 1121-30; Cruz: Tr. 1182-84, 1193, 1196-97; Morales: Tr. 1346-48, 1353-55; Nunez: Tr. 2415-16.) Morales had worked as a cashier alongside Castano for eight years and considered Castano her best friend. (Morales: Tr. 1346-48; Nunez: Tr. 2415-16.) Castano's friends and co-volunteers had never known her to "ha[ve] a lover." (Chung: Tr. 1126-27; Cruz: Tr. 1185; Morales: Tr. 1348.)

Colon also attended the ceremonial luncheon. (Portelli: Tr. 1091-95; Chung: Tr. 1117-18, 1122; Cruz: Tr. 1186-89; Morales: Tr. 1351-52, 1355-56; Nunez: Tr. 2421-23.) Colon regularly lunched at the center and was "usually . . . kind of boisterous"; he spoke loudly and "might pound the table." (Portelli: Tr. 1094-95; Chung: Tr. 1117-19, 1131-33; Cruz: Tr. 1186-89; Morales: Tr. 1351-52.) The only interaction Castano's friends ever observed between Castano and Colon was Castano pouring him tea. (Chung: Tr. 1120; Cruz: Tr. 1189-90.)

During the April 25, 2002 lunch service, Castano served tea. (Cruz: Tr. 1192-94.) At one point during the lunch, Cruz overheard Castano telling Colon and others at Colon's table that she had won $200 in Atlantic City the week before. (Chung: Tr. 1114-17; Cruz: Tr. 1190-93.) At another point, Castano took out a "bundle" of money in order to make change for a diner. (Morales: Tr. 1363.) Morales told Castano that she should not make change with her own money because "something could happen to her," and Castano replied, "'Well, I got $250.'" (Morales: Tr. 1363-67.)

At 3:30 p.m., Castano left the senior center. (Cruz: Tr. 1194-95, 1198-202; Chung: Tr. 1122-25; Morales: Tr. 1368, 1373-74.) Cruz left at the same time and saw Colon walking down the street about three feet behind Castano. (Cruz: Tr. 1194-96, 1199-202.)

Shortly before 5:00 p.m., an unidentified woman telephoned 911 and reported that a woman at 419 West 17th Street, Apartment 3A, was calling for help. (Flores: Tr. 1475-76.) In the background, a man (later identified as Colon) could be heard speaking in Spanish. (Cuesta: Tr. 1772-77, 1782, 1790-801; Flores: Tr. 1475-77.) Colon told the woman to tell the 911 operator that the victim "has asthma" and that "'this is an accident.'" (Cuesta: Tr. 1794, 1797-98; see also Miller: Tr. 966-67; Flores: Tr. 1475-76, 1556.)

At 5:02 p.m., Paramedics Christopher Myers and Matthew Miller arrived at the building in response to a radio report of an "asthmatic" in Apartment 3A. (Meyers: Tr. 1149-52, 1166-68.) The paramedics heard music coming from the apartment and found the door propped open with a typewriter. (Myers: Tr. 1153-57, 1168.) Myers found Castano in the bathtub, which was approximately three quarters full. (Myers: Tr. 1158.) Castano was submerged in the water, laying on her left side, wearing only a black shirt. (Myers: Tr. 1158-60.) There were bruises on the left side of Castano's face and rigor mortis had begun to set in. (Myers: Tr. 1160-61.)

An autopsy performed the following day determined that Castano had died from strangulation. (Flomenbaum: Tr. 2464, 2466-2467, 2495-96.)[4/] Castano's vagina had been torn about 1/16th of an inch, in a manner "indicative of forced expanding skin to the point where it ripped." (Flomenbaum: Tr. 2489-90.)[5/] Fifteen of Castano's ribs were fractured. (Flomenbaum: Tr.

---

[4/] Castano had "circular blood marks around the neck" that were the "size of fingertip" pads and "pinpoint bleeding" in the eyes that was "exceptionally" indicative of strangulation. (Flomenbaum: Tr. 2467-68.) The hyoid bone that supported the "upper part of the neck" had been "snapped" and Castano had suffered bruising and hemorrhaging in her back and neck. (Flomenbaum: Tr. 2468-69.)

[5/] When Castano was found, she had "dried fluid" on her chest, which the medical examiner swabbed as part of a sexual assault kit and found to contain skin cells that contained DNA from Castano and a man. (Flomenbaum: Tr. 2496-98; Crowther: Tr. 2788, 2798.) The DNA did not match a sample that was later taken from Colon. (Miller: Tr. 2036-37; Crowther: Tr. 2792.) The chest swab also tested positive for "amylase," an enzyme contained in bodily secretions which sometimes mixes with skin cells in saliva. (Flomenbaum: Tr. 2496-99; Crowther: Tr. 2794-805.) If the amylase had dried prior to submersion of Castano's body in the bathtub, it was possible that it would not have been washed away. (Crowther: Tr. 2761-62, 2816-18.) However, it was more likely that the secretion was deposited after Castano was removed from the tub. (Flomenbaum: Tr. 2499-501, 2506-07.) Since the DNA database against which the skin cells were tested did not contain samples from police officers or

(continued...)

2492.) The fractures ran along the side of her body, indicating a "crushing injury" by heavy pressure to her back. (Flomenbaum: Tr. 2493.) Given the number and location of the fractures, Castano's ribs could not have been cracked by slipping in the bathtub or during an effort to lift her from the tub. (Flomenbaum: Tr. 2492-93.) Castano also had "lots of bruising to the face, to the head in multiple places, several on the forehead, and different parts of the forehead, some on the cheeks, some on the eyes, some on the back of the head." (Flomenbaum: Tr. 2470.)[6] The bleeding from the wounds indicated that most, if not all, of those wounds had been inflicted before Castano was strangled. (Flomenbaum: Tr. 2496.)

At 6:00 p.m., Detective Lucas Miller arrived at Castano's apartment. (Miller: Tr. 948-49, 1918-19.) Castano lay in the bathtub with her shirt "bunched up around her chest" and there were other articles of clothing in the bathtub. (Miller: Tr. 951-53; Myers: Tr. 1162-63; Rivera: Tr. 1243-44, 1264-65.) The front door keys were in the hallway at the front of the apartment. (Miller: Tr. 955-57.) A pair of eyeglasses with broken frames were on the living room floor. (Miller: Tr. 955-59; Rivera: Tr. 1220-22, 1228, 1240-41, 1262; Camacho: Tr. 1710-20.)[7]

---

[5]    (...continued)
emergency medical workers, it was not possible to determine if the skin cells had been deposited on Castano by emergency responders. (Flomenbaum: Tr. 2499-501, 2512-13; Crowther: Tr. 2775-77.)

[6]    The injuries to Castano's face may have been caused by a fist, but the injuries to the back of her head were "much broader." (Flomenbaum: Tr. 2483-84, 2495.) Castano's tongue had been bitten and bruised by dentures that had apparently been knocked out. (Flomenbaum: Tr. 2470, 2486-88.) She had bruises and scratches on her chest and shins. (Flomenbaum: Tr. 2470-71, 2481-82, 2491.)

[7]    Officers recovered two cigarette butts: one that had been smoked down to the filter was in
(continued...)

At 10:30 or 11:00 p.m., Police Officer Anthony Flores left Castano's apartment, went downstairs to the building's lobby and spoke to a group of people, including Colon, to determine if they had seen any "strangers" around the building.  (Flores: Tr. 1459-63, 1548-51, 1680-81.)  In response to someone's question about how the police found the injured woman upstairs, Officer Flores said that a call had been made to 911.  (Flores: Tr. 1462.)  Colon promptly asked, "Do they trace 911 calls?" and Officer Flores said that "'they're probably doing that right now.'"  (Flores: Tr. 1462-63.)  Officer Flores had known Colon for about a year and had spoken to him "several times."  (Flores: Tr. 1460-61, 1463.)  Colon had a distinctive "nasal-type voice" or "lisp."  (Flores: Tr. 1463-64.)

After midnight, at the precinct, Officer Flores listened to a tape of the 911 call, which was determined to have come from a payphone on the corner of West 19th Street and Ninth Avenue.  (Miller: Tr. 966-67, 2038-39; Flores: Tr. 1465-66, 1551-53.)  Officer Flores "[i]mmediately" recognized Colon's voice instructing the 911 caller, and told that to the other officers.  (Miller: Tr. 967-68; Flores: Tr. 1466-67, 1477, 1552-53.)  After further investigation, the police learned that Colon lived in apartment 24F in Castano's building.  (Miller: Tr. 967-68; Flores: Tr. 1477-78.)

At 3:00 a.m. on April 26th, Officer Flores and Detectives Miller, Rice, Trigo and Lozada went to Colon's apartment.  (Miller: Tr. 969, 1020, 1914, 1944-46; Flores: Tr. 1478-79, 1556-57; Trigo: Tr. 2824-27.)  After about five minutes, Colon answered the door in his underwear;

---

2/      (...continued)
        an ashtray on the table, while the other was a "Wave Lights" butt on the floor just outside the bathroom.  (Rivera: Tr. 1220, 1222-23, 1229-30, 1265-66.)

the officers apologized for waking him and said that they were interviewing "everybody in the building" about what "happened to the woman in Apartment 3-A." (Miller: Tr. 969-70, 1947; Flores: Tr. 1479-80.) Colon was "[f]riendly" and "[c]ooperative." (Miller: Tr. 1021-22; Flores: Tr. 1480-83.) He recognized Officer Flores and said something like "'What's going on, Flores?'" (Flores: Tr. 1480-81.) When asked if he would come to the station house, Colon said, "no problem." (Trigo: Tr. 2827-28; Miller: Tr. 1021.) After Colon got dressed, Detectives Trigo and Lozada drove Colon to the precinct. (Miller: Tr. 1022, 1026-27, 1961-62; Flores: Tr. 1482-84, 1561; Trigo: Tr. 2827-28.) The detectives made small talk with Colon, but neither of them asked Colon about the case. (Trigo: Tr. 2828-30.) Their conversation was confined to asking Colon if he was "all right" and needed to use the bathroom or wanted anything to drink. (Trigo: Tr. 2830.) Colon was not under arrest and was not handcuffed. (Miller: Tr. 1028; Flores: Tr. 1485.)

At 4:00 a.m., Officer Flores and Detectives Miller and Rice spoke to Colon in an interview room for twenty to thirty minutes. (Miller: Tr. 1027-29, 1032, 1915, 1962, 1972-73, 1976; Flores: Tr. 1484-86, 1491, 1569-70, 1575, 1687-88.) They noticed that Colon had "some cuts [and] scrapes" on the knuckles and top of his right hand and that his fingernails were "[c]lipped down to the flesh." (Miller: Tr. 1036-37, 1891; Flores: Tr. 1515.) Officer Flores asked Colon to tell them what had happened. (Flores: Tr. 1486.) Colon said that he was walking by 419 West 17th Street when he heard someone call for help. (Miller: Tr. 1029-30; Flores: Tr. 1486-87.) Initially, Colon denied knowing from which apartment the screams had come. (Miller: Tr. 1968-69; Flores: Tr. 1489.) But, when asked how he knew to tell the 911 operator that the woman was having an asthma attack, Colon indicated that he knew Castano was asthmatic and "assumed" she was having an

attack. (Miller: Tr. 1029-30; Flores: Tr. 1487.) When asked why he did not help her himself, Colon said that he also was afraid that someone was attacking her and that he too might be attacked. (Miller: Tr. 1030, 1965-68.)

At 6:00 a.m., Detective Harvey Kane spoke with Colon. (Kane: Tr. 1729-31.) Colon claimed that he had been at a bodega on West 19th Street and Ninth Avenue when a woman came in and said that another woman was having an asthma attack at 419 West 17th Street. (Kane: Tr. 1731-32.) After speaking with Detective Rice, Detective Kane returned to the interview room and spoke to Colon for another ten to fifteen minutes. (Kane: Tr. 1732-36, 1746.) Colon now said that he had been walking past 419 West 17th Street when he heard a woman screaming from the window of Apartment 3A that she had a heart condition and asthma and needed the police. (Kane: Tr. 1734-35.)

At 9:30 a.m., Detective William Mendez spoke to Colon for about an hour; Officer Flores and Detective Randall Roca were in and out of the interview room. (Flores: Tr. 1492, 1565, 1580-90; Mendez: Tr. 2060-69, 2119-24, 2139, 2218-19, 2226, 2239-40, 2256, 2292-93.) Detective Mendez told Colon, in a conversational tone, that he was there to try to find out what had happened and that he understood Colon had some information to provide. (Mendez: Tr. 2121.) Detective Mendez said he understood Colon had called 911, and Colon confirmed that he had. (Mendez: Tr. 2123.) Colon said that he had been passing 419 West 17th Street when he heard a "faint" cry for help from the seventh or tenth floor of the building. (Flores: Tr. 1590-91; Mendez: Tr. 2069-71, 2123-29, 2205-06, 2251-54, 2267.) When Detective Mendez asked how Colon could have heard a cry from that high, Colon stated that the cries had come from the third floor and, later, specified that

they had come from Apartment 3A.  (Flores: Tr. 1493-94, 1597, 1605; Mendez: Tr. 2254-56, 2320.)

Colon said that Castano was being attacked and that he had not helped her because he feared being

attacked.  (Flores: Tr. 1493-94, 1573-74, 1599-602; Mendez: Tr. 2288-92.)  Colon added that he had

run about two blocks to a store, where he enlisted a woman to call 911.  (Flores: Tr. 1603-04;

Mendez: Tr. 2071-73, 2125-26, 2294-96.)

At first, Colon denied recognizing the woman calling for help from the apartment,

and claimed not to know Castano.  (Mendez: Tr. 2134-36, 2316, 2412-13.)  Then, he admitted to

having seen Castano at the senior center and inside 419 West 17th Street the previous day.  (Mendez:

Tr. 2136-38, 2316-20.)  Asked about his whereabouts earlier on April 25th, Colon said that, at about

9:00 a.m., he had helped a woman in a wheelchair to her apartment on the third floor of 419 West

17th Street.  (Mendez: Tr. 2132-33, 2308.)  Later in the conversation, Colon said he helped the

woman between 3:00 and 3:30 p.m.  (Flores: Tr. 1507, 1606-07, 1611-22, 1639; Mendez: Tr. 2133-

34, 2249, 2309-10, 2313-14.)  Officer Flores told Colon, "several times," that he was not under arrest

and could leave at any time; Colon responded that "he had no problems . . . because he didn't do

anything wrong."  (Flores: Tr. 1509.)

At 10:30 a.m., Detective Antonio Rivera arrived at the precinct and recognized Colon,

who lived in the same building as Detective Rivera's parents.  (Flores: Tr. 1510-11, 1639-40; Rivera:

Tr. 1813-17, 1823-24, 1830-31; Mendez: Tr. 2142, 2321, 2329-30.)  After talking to the Lieutenant,

at about 11:00 a.m. Detective Rivera saw Colon speaking on the telephone outside the interview

room.  (Rivera: Tr. 1815-16, 1831-33.)  Colon called over Detective Rivera, who he knew, and they

spoke in the interview room for about five minutes. (Rivera: Tr. 1816-17, 1833; Mendez: Tr. 2143-

44, 2326.) Colon said that the "police were talking to him" about a "lady that was found dead in the building" and Colon "wanted to know if there was any evidence." (Rivera: Tr. 1818, 1833-34.) Detective Rivera said he did not know and advised Colon to "'[j]ust tell the truth.'" (Rivera: Tr. 1818.)

After speaking with Detective Rivera, Detective Mendez and Officer Flores resumed questioning Colon. (Flores: Tr. 1511-12, 1643; Rivera: Tr. 1819, 1837-38; Mendez: Tr. 2321-25, 2339-41.) Colon asked about the possibility of probation. (Mendez: Tr. 2323, 2339-40.) Detective Mendez responded that that would be up to the judge. (Mendez: Tr. 2324.)

At 11:30 a.m., Detective Rivera returned to the interview room, and Colon said he was embarrassed and asked Detective Rivera if they could speak in private. (Rivera: Tr. 1819-22, 1835-38.) Colon and Detective Rivera went into an adjacent room. (Rivera: Tr. 1820; Mendez: Tr. 2342-45.) Colon volunteered to Detective Rivera that he had had sex with Castano in her living room and bathroom. (Rivera: Tr. 1820.) Detective Rivera told Colon to stop, took him back to the interview room, and told Detective Mendez to read Colon his <u>Miranda</u> rights. (Rivera: Tr. 1821.)

At 11:45 a.m., Detective Mendez explained to Colon his <u>Miranda</u> rights; Colon acknowledged that he understood those rights and agreed to waive them and to answer questions. (Mendez: Tr. 2144-52, 2348-52, 2397.) Detective Mendez spoke to Colon for about an hour and a half and, at Colon's request, wrote out a summary of Colon's statement and then read the statement back to Colon, who said that it was accurate. (Mendez: Tr. 2157-58.)

At 1:20 p.m., Colon signed the statement (Mendez: Tr. 2157-60), which read:

"I, Juan R. Colon, born on 11/26/35, state on a couple of occasions I had sexual relations with that lady. That day about 4:00 PM she had told me to meet her at the lobby. I went with her to her apartment to have sexual relations.

"When we arrived at the apartment, she took off her clothes. I tried to get her but she wanted to take a bath first.

"She went to the bathroom and opened up the water valves. When she was bent over, I tried to make love to her from behind.

"When I tried to penetrate her with her consent, she went head first hitting her head or her face on the bathtub rendering her unconscious.

"When I saw this, I panicked and ran to call the police. I ran because I panicked and didn't want any problems.

"It wasn't my fault. She insisted that I make love to her, that way from behind, into the vagina.

"I called the police to try to save her life. This was an accident. And if possible, I would like to plead guilty in exchange for a sentence of probation."

(Mendez: Tr. 2166-67.)  Colon also said that, after he left Castano's apartment, he went home, cut his fingernails, showered, and changed his clothes because they were wet. (Mendez: Tr. 2167-69, 2370-73.)

From 1:30 to 8:00 p.m., there was an officer in the interview room with Colon. (Mendez: Tr. 2374-75.) At several points, as Detective Mendez walked by the room, Colon called out to him to try to obtain probation for Colon. (Mendez: Tr. 2375-76.)

At 8:00 p.m., ADAs Hobbs and Nobel and an interpreter arrived at the precinct and took a videotaped statement from Colon. (Miller: Tr. 1043.) With the aid of the interpreter, ADA Hobbs again explained to Colon his Miranda rights; Colon again acknowledged and waived those rights and agreed to answer questions. (Mendez: Tr. 2170-72.)

Colon said that, about 15 years earlier, he had commenced a sexual relationship with Castano and that they would typically "go to hotels." (State Br. at 26.)  However, they had not been intimate for about two years.  (Id.)  Nonetheless, at about 3:30 p.m. the previous afternoon, Castano had approached Colon at the senior center and had invited him to her apartment to have sex.  (Id.)  At about 4:00 p.m., Colon met Castano in the lobby of 419 West 17th Street, and they proceeded separately to Castano's apartment.  (Id.)  Castano began to draw a bath.  (Id.)  Colon came up behind Castano and tried to "'have sex'" with her, but she slipped and fell into the bathtub.  (Id.)  Colon tried unsuccessfully to get Castano out of the tub.  (Id.)  Colon "'panicked,'" left the apartment, and found a "'stranger'" to call 911.  (Id.)  At one point, Colon referred to the 911 caller as a "'friend,'" then immediately said that he did not know her.  (Id.)  When the police came to his apartment, Colon "'confessed'" to the "'accident.'"  (Id.)

At about 8:38 p.m., Colon said that he wanted to finish the interview because he did not "'feel well;'" he asked for, and received, blood pressure medication, and the interview was suspended for approximately forty minutes.  (Mendez: Tr. 2181, 2189, 2376-77; State Br. at 26.)  During the break, Colon asked Detective Mendez how he thought the interview was going and whether he thought Colon would be charged with first-degree murder.  (Mendez: Tr. 2190-92, 2377-78.)  Colon did not express any further concern about his health.  (Mendez: Tr. 2191-93.)

At 9:20 p.m., the videotaped interview resumed.  (State Br. at 26.)  Colon said that he felt better and that he would continue to answer questions.  (Id.)  Colon reiterated his account of Castano's death and ADA Hobbs questioned Colon.  (Id.)  When asked what he had done to help Castano, Colon said that he had grasped her around the neck in an attempt to lift her from the

bathtub, but that she had fallen back into the tub.  (<u>Id</u>.)  Colon suggested that the bruises around

Castano's face had been caused either by her fall or during an effort by Castano to lift herself from

the tub.  (<u>Id</u>.)  Colon said that Castano's underwear might have ended up in the bathtub when Castano

fell, since she had undressed in the living room and carried her clothes into the bathroom.  (<u>Id</u>.)

Colon explained the broken eyeglasses in the living room by saying that Castano's glasses had fallen

off when she was undressing, and Colon had stepped on them.  (<u>Id</u>.)  When asked why Colon had

not called the police from Castano's apartment, Colon said that he "'panicked.'"  (<u>Id</u>.)  Finally, ADA

Hobbs asked Colon whether he remembered telling a detective that he had heard Castano calling for

help as he walked by the building.  (<u>Id</u>.)  Colon denied having made such a statement.  (<u>Id</u>.)

### Colon's Jail-House Confession

From February 6, 2003 until August 6, 2003, Colon and Eugenio Cintron were housed

in the same housing unit at Riker's Island.  (Lyons: Tr. 2536-41; Cintron: Tr. 2579-81, 2622.)  At the

time of Colon's trial, Cintron was incarcerated and testified pursuant to a cooperation agreement.

(Cintron: Tr. 2565, 2648, 2660-62, 2698-99.)  In exchange for truthful testimony, he would be

allowed to plead to a lesser offense and receive a sentence of one and one-half to three years.

(Cintron: Tr. 2652-53.)  Cintron admitted that he had a long record, including four felony

convictions.  (Cintron: Tr. 2565-80, 2652-53, 2672-73, 2678-79, 2691-95, 2699, 2702.)

Colon and Citron knew people in common, became friendly in prison, and at Colon's

request Cintron translated Colon's indictment from English into Spanish for him.  (Cintron: Tr. 2623-

29, 2645.)  One day, Colon brought Cintron to his cell and said that he was going to tell Cintron

"everything" about his case and wanted Cintron to help him and review "his papers."  (Cintron: Tr.

2629-33, 2645.)  Cintron urged Colon to speak to somebody in the law library, but Colon said he "don't trust nobody" and preferred to speak to Cintron.  (Cintron: Tr. 2632, 2645.)

According to Cintron:  Colon said that "in the building he lives at," there was "this lady named Dolly" Castano who lived in Apartment 3A, while Colon lived on the 24th floor.  (Cintron: Tr. 2633, 2642-45.)  One day, Colon went to Castano's door, entered her apartment and Colon "asked her for drugs," but Castano "said that she didn't have anything." (Cintron: Tr. 2633-35, 2643, 2663.)  "[O]nce the door was shut," Colon "pushed" and "hit" Castano, grabbed her neck, and began choking her.  (Cintron: Tr. 2633-37.)  Colon "just kept on choking" Castano and "demanding, where the drugs was at." (Cintron: Tr. 2635, 2644.)  Then, "the devil came into him" and Colon had "forcible sex" with Castano while "on top of her." (Cintron: Tr. 2635-38.)  Colon continued choking Castano even "after he had finished having his sexual pleasure."  (Cintron: Tr. 2636.)  By then, Castano was "already stiff." (Cintron: 2636, 2638, 2644.)

According to Cintron:  Colon said he "got paranoid," "got the drugs" and "some money," and went downstairs to buy lottery tickets.  (Cintron: Tr. 2638, 2644.)  Colon told "this young girl" who lived in a building next to his to call 911 and say that "Dolly had an attack." (Cintron: Tr. 2639-40.)  When Cintron asked the girl's name, Colon said "that wasn't important" and that "she's not going to be found." (Cintron: Tr. 2639.)  Colon said that he made statements to the police, including one "on a tape," but did not discuss their contents with Cintron.  (Cintron: Tr. 2640-42.)  Colon said that he was going to say that he was sitting on a bench outside the building when he saw "a man grabbing Dolly and that she was screaming through the window" and that Colon saw "another man in the lobby." (Cintron: Tr. 2643.)

Cintron again urged Colon to go to the law library, but Colon reiterated that he did not trust anyone else. (Cintron: Tr. 2645.) Cintron said that he did not have enough knowledge to help, and Colon stopped discussing the matter with him. (Cintron: Tr. 2665-66.) The only document related to Colon's case that Cintron saw was the indictment, which contained no information about strangling or robbing Castano. (Cintron: Tr. 2645-46.) After the conversation, Cintron wrote down what Colon had told him and gave the statement to his attorney in the fall of 2003. (Cintron: Tr. 2646-47, 2666.)

At trial, when Cintron entered the courtroom to testify, Colon yelled at him, in Spanish, "'Snitch; I'm going to kill you.'" (Cintron: Tr. 2619-22.)

**Charge Conference**

During the lengthy charge conference, Colon's counsel initially sought to have the jury instructed on three theories under which the jury might disregard some or all of Colon's statements to the police: (1) that Colon was in custody and questioned prior to receiving Miranda warnings and that such statements should be disregarded (Tr. 3053, 3083-97); (2) that Colon had invoked his right to silence during post-Miranda questioning by Detective Mendez between 11:45 a.m. and 1:20 p.m. and that any statements after Colon's purported invocation should be disregarded (Tr. 3053-54); and (3) that Colon's videotaped statement should be disregarded if the jurors determined that it was part of a chain of continuous interrogation that included the alleged Miranda violation (Tr. 3054-58, 3079-81, 3109-13).

Justice Kahn agreed to instruct the jurors to disregard any custodial statements made prior to Miranda warnings and any portion of the post-Miranda interview with Detective Mendez

that followed an invocation of Colon's right to remain silent.  (Tr. 3062-64, 3097-102, 3110, 3115-16, 3124.)  However, Justice Kahn questioned the factual basis to deliver an instruction regarding Colon's videotaped statement and, in the absence of "any appellate authority," declined to charge the jury to resolve whether Colon's videotaped statement was attenuated from any prior infirmity.  (Tr. 3055-57, 3079, 3102-09, 3113-15.)

Over the weekend, Colon's counsel crafted a new proposed instruction; after discussion of Colon's revised charge request, Justice Kahn adhered to her prior ruling.  (Tr. 3129-41.) In response, in a "tactical position," Colon's attorney stated that because "of the Court's ruling with regard to our continuous interrogation charge, and our proposed ruling with regard to the 5th Amendment violation charge, the Defense feels constrained to withdraw our request to charge on both custody and on the right to silence, and we are no longer requesting that charge."  (Tr. 3143.) Colon's counsel then requested that Justice Kahn instruct the jury to disregard statements that were the product of "undue pressure," "promises," "threats," or "trickery."  (Tr. 3144-53.)  When Justice Kahn asked for the record basis supporting such an instruction, Colon's counsel argued that the jury could conclude that Colon had been "promised probation in exchange for giving a statement."  (Tr. 3151.)  Justice Kahn acknowledged that Colon may have asked Detective Mendez about probation, but inquired what Detective Mendez had said that could be construed as a promise that Colon would receive it.  (Tr. 3151-52.)  Colon's counsel responded that "it's an inference [he] would ask the jury to draw."  (Tr. 3152.)

Justice Kahn stated that it was "unforgivable" that Colon's attorney had waited until that late juncture to espouse a theory of traditional voluntariness and that there was "no way" she

previously "would have been alerted" to Colon's counsel's newly-minted "argument about trickery." (Tr. 3152-53, 3154.) Justice Kahn further observed that a waiver of <u>Miranda</u> rights at the outset of custodial questioning generally addressed the concerns of traditional voluntariness and that Colon had never disputed that his <u>Miranda</u> waivers were voluntary. (Tr. 3159-62.) Accordingly, Justice Kahn concluded that a traditional voluntariness charge might be warranted only for Colon's statements prior to receiving <u>Miranda</u> warnings at 11:45 a.m. (Tr. 3162.)

Colon's counsel replied that he either wanted the charge "to apply to all the statements in question or I don't want the charge at all." (Tr. 3163.) When Justice Kahn reiterated that such an instruction would not apply to Colon's post-<u>Miranda</u> statements, Colon's counsel simply noted that, "with regard to all of them," he "would argue" that Colon had been "tired," "under psychological pressure," "confused by the police," and denied medication. (Tr. 3163.) Justice Kahn stated that Colon could argue that those factors drew into question the reliability of Colon's statements, but adhered to her ruling regarding the jury instructions. (Tr. 3163.)

## <u>Closing Argument by Colon's Counsel</u>[8/]

Colon's counsel argued that Colon's statements were the result of his "adopt[ing] things that are suggested to him" by the police. (<u>E.g.</u>, Tr. 3237, 3240.) Colon's counsel argued that as the pressure on Colon from the interrogation kept building, Colon was told that if he confessed, "5 years probation" is a real possibility. (Tr. 3241, 3246-47.) Colon "says it's an accident because

---

[8/]     In his opening statement, Colon's counsel had stated that the case was "about how Mr. Colon was manipulated, befriended, scolded, cajoled, flattered, confused, tag teamed and led until he admitted that he was the killer," even though he was "an inocent man." (Tr. 944-45.)

then he's giving police whe he thinks they want, and he can go back home with 5 years probation."
(Tr. 3247.)  As to Colon's videotaped statement, Colon's counsel argued that the ADA suggested
facts, such as strangulation, and Colon incorporated such details into his story.  (Tr. 3251-56.)
Colon's counsel further suggested that just as Colon "played up" to Detective Mendez when
Detective Mendez befriended him, so too with Cintron in prison.  (Tr. 3259-66.)

### Verdict and Sentencing

On March 9, 2004, the jury convicted Colon of two counts of first-degree murder on
theories that he had intentionally murdered Dolly Castano during the course of a rape and burglary.
(Tr. 3490-93.)  On April 22, 2004, Justice Kahn sentenced Colon to concurrent prison terms of 25
years to life imprisonment.  (Dkt. No. 11: 4/22/04 Sentencing Transcript at 34-35.)  Colon insisted
at sentencing that he was "innocent" and "didn't touch that woman."  (Id. at 25.)

### Colon's Direct Appeal

In February 2007, Colon appealed to the First Department.  (Dkt. No. 12: State Ans.
& App. Ex. B: Colon 1st Dep't Br.)  Colon did not contest the admission of his statements to the
police at his apartment and during initial questioning at the precinct through about 6:30 a.m.  (Colon
1st Dep't Br. at 8-11, 78.)  Colon did contend, however, that during Detective Mendez's 10:00 a.m.
questions, he came into custody.  (Id. at 88.)  Colon argued that his statements between 11:15 a.m.
and 11:40 a.m. to Detective Rivera, including his admission he had sex with Castano in her
apartment, should have been suppressed as the product of custodial interrogation.  (Id. at 21-23, 78.)

At 11:45 a.m., Colon waived his Miranda rights and admitted to a role in Castano's
death, culminating in a written statement at 1:20 p.m.  (Id. at 23-24.)  At 8:00 p.m., Colon reiterated

his confession in a videotaped statement made to an ADA. (Id. at 25-26.) Focusing on his videotaped statement, Colon argued that his post-Miranda statements were part of a "continuous chain" of questioning and should have been suppressed. (Id. at 95.) Colon further argued that the hearing court erred in allocating to Colon the burden of proving that he had been in custody prior to the issuance of Miranda warnings. (Id.)

As to trial, Colon argued that the trial court erred in not instructing the jury to consider the voluntariness of his statements to the police. (Id. at 98.) In particular, Colon argued that the trial court should have instructed the jury to consider whether his videotaped statement had been part of a "single chain" of interrogation beginning with custodial pre-Miranda questioning. (Id.) Colon argued that during his time at the station house he "remained in the same room, in the custody of the same interrogators, under guard, and repeatedly questioned Mendez about probation during that entire time span, as well as the fact that Mendez was present during the videotaped interrogation, and that the A.D.A. made repeated references to [Colon's] prior statements." (Id. at 101-02.) Colon further argued that Justice Kahn erred in not delivering "general instructions" from the New York pattern jury instructions regarding the voluntariness of statements. (Id. at 98, 105-15.)

On September 23, 2008, the First Department affirmed Colon's conviction. People v. Colon, 54 A.D.3d 621, 864 N.Y.S.2d 14 (1st Dep't 2008). The First Department found that the hearing court had properly denied Colon's suppression motion:

> The court properly denied [Colon's] motion to suppress statements. The People established that the statements [Colon] made prior to Miranda warnings were not the product of custodial interrogation, because a reasonable innocent person in [Colon's] position would not have thought he was in custody. [Colon] voluntarily accompanied the police to the precinct, where he was expressly told he was not under

arrest and was free to leave. Although he remained there over an extended period of time and was questioned with increasing intensity, he was never handcuffed or otherwise restrained, he was left alone and unguarded in an unlocked interview room for significant periods of time, and he was permitted to go to the bathroom unescorted. The fact that the police expressed skepticism about [Colon's] story did not render the questioning custodial. "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." Furthermore, it was [Colon] who initiated the conversation with a detective, whom he knew from the neighborhood, in which he first admitted having had sex with the elderly victim on the day of the murder. The detective immediately stopped the conversation and, after <u>Miranda</u> warnings were administered, [Colon] waived his rights and gave a written statement implicating himself in the murder.

<u>People</u> v. <u>Colon</u>, 54 A.D.3d at 622, 864 N.Y.S.2d at 15 (citations omitted).

The First Department also found the videotaped confession to be removed from any possible prior taint: "Following a 6 1/2-hour break, and after readministration of warnings, [Colon] made a videotaped confession" and the "evidence also supports the hearing court's finding that the videotaped statement was sufficiently attenuated from the earlier police questioning to remove any possible taint arising from any prior constitutional violation." <u>People</u> v. <u>Colon</u>, 54 A.D.3d at 622, 864 N.Y.S.2d at 15.

The First Department held that while Colon "would have been entitled to a jury charge on the issue of the voluntariness of his pre-<u>Miranda</u> precinct statements, defense counsel withdrew the request for such a charge after the court declined to give a voluntariness charge with respect to the videotaped statement." <u>People</u> v. <u>Colon</u>, 54 A.D.3d at 622, 864 N.Y.S.2d at 15 (citation omitted). The First Department continued that the trial court was correct to decline to charge with regard to the videotaped statement because "the trial evidence did not raise an issue of fact for the jury as to whether the videotaped statement was voluntarily given after a clear break in

questioning." <u>People</u> v. <u>Colon</u>, 54 A.D.3d at 622-23, 864 N.Y.S.2d at 15. Finally, the First Department found "no reasonable possibility that, had it been instructed on the issue of voluntariness, the jury would have found the videotaped statement, or any of [Colon's] other statements, to be involuntary." <u>People</u> v. <u>Colon</u>, 54 A.D.3d at 623, 864 N.Y.S.2d at 15..

On January 23, 2009, the New York Court of Appeals denied leave to appeal. <u>People</u> v. <u>Colon</u>, 11 N.Y.3d 923, 874 N.Y.S.2d 9 (2009).

## Colon's Federal Habeas Petition

On June 15, 2009, Colon filed his federal habeas corpus petition, contending that: (1) he was subjected to "custodial interrogation without <u>Miranda</u> warnings" and (2) "the trial court refused to instruct the jury that [Colon's] post <u>Miranda</u> statement should be disregarded." (Dkt. No. 2: Pet.¶ 13; Dkt. No. 20: Colon Traverse at 7.)[9/]

---

[9/] Colon's traverse appears to raise an additional claim of "actual innocence." (Colon Traverse at 3-6.) Colon did not raise an actual innocence claim on direct appeal nor in his habeas petition. He cannot now raise it in the "fact" section of his traverse. In any event, claims of actual innocence "have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying course of the state criminal proceeding." <u>Herrera</u> v. <u>Collins</u>, 506 U.S. 390, 400, 113 S. Ct. 853, 860 (1993); <u>accord</u>, <u>e.g.</u>, <u>Pierre</u> v. <u>Ercole</u>, 607 F. Supp. 2d 605, 607 n.13 (S.D.N.Y. 2009). Furthermore, since Colon's assertion of innocence is based on evidence adduced at trial – the DNA evidence found on Castano's body that did not match Colon's DNA (<u>see</u> page 19 n.5 above; Colon Traverse at 5) – it is not a claim of actual innocence as that term is used to overcome procedural bars in habeas litigation. A credible claim of actual innocence requires "'new reliable evidence that was not presented at trial'" which demonstrates that "'it is more likely than not that no reasonable juror would have found [the petitioner] guilty beyond a reasonable doubt.'" <u>Lucidore</u> v. <u>N.Y. State Div. of Parole</u>, 209 F.3d 107,114 (2d Cir. 2000); <u>e.g.</u>, <u>Whitely</u> v. <u>Senkowski</u>, 317 F.3d 223, 225 (2d Cir. 2003) (citing <u>Lucidore</u> v. <u>N.Y.State Div. of Parole</u>, 209 F.3d at 114). This requires a "truly 'extraordinary'" presentation of compelling proof, such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical
(continued...)

**ANALYSIS**

I.     **THE AEDPA REVIEW STANDARD**

Before the Court can determine whether Colon is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[10]

---

[9]     (...continued)
evidence." <u>Schlup</u> v. <u>Delo</u>, 513 U.S. 298, 324-27, 115 S. Ct. 851, 865 (1995). Here, Colon's argument is based entirely on evidence that was before the jury (<u>i.e.</u>, that the DNA evidence on Castano's body did not come from Colon), and, thus, cannot support a claim of actual innocence.

[10]     <u>See also</u>, <u>e.g.</u>, <u>Knowles</u> v. <u>Mirzayance</u>, 129 S. Ct. 1411, 1418 (2009); <u>Henry</u> v. <u>Poole</u>, 409 F.3d 48, 67 (2d Cir. 2005), <u>cert. denied</u>, 547 U.S. 1040, 126 S. Ct. 1622 (2006); <u>Howard</u> v. <u>Walker</u>, 406 F.3d 114, 121-22 (2d Cir. 2005); <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d 193, 197 (2d Cir. (continued...)

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 404-05, 120 S. Ct. at 1519.[11/] Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 412, 120 S. Ct. at 1523.[12/] "That federal law, as defined by the

---

[10/]   (...continued)
2004); <u>Dallio</u> v. <u>Spitzer</u>, 343 F.3d 553, 559-60 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 961, 124 S. Ct. 1713 (2004); <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'") (quoting <u>Lainfiesta</u> v. <u>Artuz</u>, 253 F.3d 151, 155 (2d Cir. 2001), <u>cert. denied</u>, 535 U.S. 1019, 122 S. Ct. 1611 (2002)).

[11/]   Accord, <u>e.g.</u>, <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d 175, 181 (2d Cir.), <u>cert. denied</u>, 540 U.S. 1091, 124 S. Ct. 962 (2003); <u>Jones</u> v. <u>Stinson</u>, 229 F.3d 112, 119 (2d Cir. 2000); <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d 113, 125 (2d Cir. 2000), <u>cert. denied</u>, 532 U.S. 943, 121 S. Ct. 1404 (2001); <u>Clark</u> v. <u>Stinson</u>, 214 F.3d 315, 320 (2d Cir. 2000), <u>cert. denied</u>, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[12/]   Accord, <u>e.g.</u>, <u>Georgison</u> v. <u>Donelli</u>, 588 F.3d 145, ___, 2009 WL 4546349 at *7 (2d Cir. 2009); <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d 160, 164 (2d Cir.), <u>cert. denied</u>, --- S. Ct. ---, 2009 WL 3268661 (Nov. 16, 2009); <u>Carey</u> v. <u>Musladin</u>, 549 U.S. 70, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from the Court regarding this [issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. 652, 659, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. 63, 72, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); <u>Hargett</u> v. <u>Giambruno</u>, 291 Fed. Appx. 402, 403 (2d Cir. 2008); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d 587, 591 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 1047, 124 S. Ct. 2171 (2004); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d 1197, 1200 (2d Cir. 2002); <u>Yung</u> v. <u>Walker</u>, 341 F.3d 104, 109-110 (2d Cir. 2003); <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d 36, 42 (2d Cir.), <u>cert. denied</u>, 537 U.S. 909, 123 S. Ct. 251 (2002); <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d 178, 184 (2d Cir. 2001); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 309 (2d Cir. 2001).

Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d at 42; <u>accord, e.g.</u>, <u>Davis</u> v. <u>Grant</u>, 532 F.3d 132, 140 (2d Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 1312, 2009 WL 425166 at *1 (Feb. 23, 2009). "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 110; <u>accord, e.g.</u>, <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200.

> As to the "contrary to" clause:

> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . . A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

<u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[13]

---

[13]     Accord, <u>e.g.</u>, <u>Knowles</u> v. <u>Mirzayance</u>, 129 S. Ct. at 1419 (The Supreme "Court has held on numerous occasions that it is not 'an unreasonable application of clearly established federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this [Supreme] Court.") (quotation omitted); <u>Brown</u> v. <u>Payton</u>, 544 U.S. 133, 125 S. Ct. 1432, 1438-39 (2005); <u>Bell</u> v. <u>Cone</u>, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); <u>Price</u> v. <u>Vincent</u>, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); <u>Lockyer</u> v. <u>Andrade</u>, 123 S. Ct. at 1173-74; <u>Ortiz</u> v. <u>N.Y.S. Parole in Bronx, N.Y.</u>, 586 F.3d 149, 156 (2d Cir. 2009); <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 164; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d 238, 242 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1215, 127 S. Ct. 1267 (2007); <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d 210, 219 (2d Cir.), <u>cert. denied</u>, 546 U.S. 889, 126 S. Ct. 215 (2005); <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d at 591; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200; <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 109; <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d at 42; <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d at 184; <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d at 127-28.

In <u>Williams</u>, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 413, 120 S. Ct. at 1523.[14] However, "[t]he term 'unreasonable' is . . . difficult to define." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 410, 120 S. Ct. at 1522. The Supreme Court made clear that "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Id</u>.[15] Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u> v. <u>Taylor</u>,

---

[14] Accord, <u>e.g.</u>, <u>Wadddington</u> v. <u>Sarausad</u>, 129 S. Ct. 823, 831 (2009); <u>Brown</u> v. <u>Payton</u>, 544 U.S. at 141, 125 S. Ct. at 1439; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2534-35; <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d 80, 87 (2d Cir.), <u>cert. denied</u>, --- S. Ct. ---, 2009 WL 2336997 (Nov. 30, 2009); <u>Jones</u> v. <u>West</u>, 555 F.3d 90, 96 (2d Cir. 2009); <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1257, 127 S. Ct. 1383 (2007); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181.

[15] See also, <u>e.g.</u>, <u>Wadddington</u> v. <u>Sarausad</u>, 129 S. Ct. at 831; <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly.'") (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002)); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 165-66 (A "federal court might agree with a petitioner that the relevant federal law should have been interpreted differently than the way it was interpreted by the state court yet still conclude that the state court's application of federal law was not unreasonable."); <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d at 87-88; <u>Jones</u> v. <u>West</u>, 555 F.3d at 96; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 124-25; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

529 U.S. at 409, 120 S. Ct. at 1521.[16/] "Objectively unreasonable" is different from "clear error."

Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness."). This is a

"substantially higher threshold" than incorrectness. Knowles v. Mirzayance, 129 S. Ct. at 1420.[17/]

"[T]he range of reasonable judgment can depend in part on the nature of the relevant rule."

Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149.[18/] "Even if the state court issues a

---

[16/] Accord, e.g., Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v. Smith, 539 U.S. at 520-21, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct. at 1853; Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti, 537 U.S. at 25-27, 123 S. Ct. at 360-61; Dunlap v. Burge, 583 F.3d at 165; Davis v. Grant, 532 F.3d at 140; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 128 S. Ct. 75 (2007); Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 128-29.

[17/] However, the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Jones v. Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).; accord, e.g., Brisco v. Ercole, 565 F.3d at 88; Jones v. West, 555 F.3d at 96; Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008) ("[W]e have observed that the "unreasonable application 'standard falls somewhere between merely erroneous and unreasonable to all reasonable jurists.'"); Davis v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197, 200-01; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Yung v. Walker, 341 F.3d at 110; Loliscio v. Goord, 263 F.3d at 184.

[18/] The Supreme Court explained:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning
> (continued...)

decision 'contrary to' clearly established Supreme Court law, . . . a petitioner 'cannot obtain relief . . . unless application of a *correct* interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" Cousin v. Bennett, 511 F.3d 334, 339 (2d Cir.), cert. denied, 128 S. Ct. 2910 (2008).

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." Kennaugh v. Miller, 289 F.3d at 45.[19]

---

[18]   (...continued)
must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149; accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at 1426 (Where the Supreme Court "standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."); Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d at 157; Dunlap v. Burge, 583 F.3d at 166; Hawkins v. Costello, 460 F.3d at 243.

[19]   Accord, e.g., Davis v. Grant, 532 F.3d at 140-41; Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; see Yarborough v. Alvarado, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision. There is force to this argument. Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519. "[I]t is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to the record in an unreasonable manner." Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009); accord, e.g., Georgison v. Donelli, 2009 WL 4546349 at *7.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan v. Kuhlman, 261 F.3d at 312; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853 ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Wilson v. Mazzuca, 570 F.3d 490, 499 (2d Cir. 2009) ("Where, as here, 'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court

precedent.'").[20]  Even if the federal court holds an evidentiary hearing, the deferential AEDPA review standard applies.  Wilson v. Mazzuca, 570 F.3d at 501-02 ("Where . . . a district court has performed additional fact finding, the court must then ask whether the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' . . . in light of any newly-discovered facts. . . . [W]e are directed to apply the same AEDPA standard that would otherwise be in force, now in light of the new information that has been obtained through a § 2254(e) hearing.").

Where the state court decision is not clear as to whether it rests on federal law or state procedural law, the Second Circuit in Jimenez v. Walker, 458 F.3d 130, 145-46 (2d Cir. 2006), cert. denied, 549 U.S. 1133, 127 S. Ct. 976 (2007), instructed that the court must "examine the three clues laid out in Coleman, Quirama and Sellan" – that is, "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances."  Jimenez v. Walker, 458 F.3d at 145 & n.16; accord, e.g., Clark v. Perez, 510

---

[20]  See also, e.g., Mosby v. Senkowski, 470 F.3d at 519; Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 220; Wade v. Herbert, 391 F.3d 135, 140 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'" "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254." Moreover, "if any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate Division disposition – the word 'denied' – triggered AEDPA deference.").

F.3d 382, 394 (2d Cir.), <u>cert. denied</u>, 129 S. Ct. 130 (2008). Using these three factors, the court

should classify the decision as either:

> (1)    fairly appearing to rest primarily on federal law or to be interwoven with federal law or
>
> (2)    fairly appearing to rest primarily on state procedural law.

> Absent a clear and express statement of reliance on a state procedural bar, the <u>Harris</u> presumption applies to decisions in the first category and deems them to rest on the merits of the federal claim. Such decisions are not procedurally barred and must be afforded AEDPA deference as adjudications "on the merits" under 28 U.S.C. § 2254(d). The <u>Harris</u> presumption does not apply to decisions in the second category, which show themselves to rest on an independent state procedural bar. Nor does it apply to decisions in the first category which contain a clear statement of reliance on a state procedural bar. No AEDPA deference is due to these decisions, but the state may successfully assert that habeas relief is foreclosed provided that the independent state procedural bar is adequate to support the judgment and that neither cause and prejudice nor a fundamental miscarriage of justice is shown.

> The effect of these rules is to present federal habeas courts with a binary circumstance: we either apply AEDPA deference to review a state court's disposition of a federal claim or refuse to review the claim because of a procedural bar properly raised. The middle ground . . . does not exist.

<u>Jimenez</u> v. <u>Walker</u>, 458 F.3d at 145-46 (citations & fns. omitted); <u>accord</u>, <u>e.g.</u>, <u>Hawkins</u> v. <u>Costello</u>,

460 F.3d at 242 ("In <u>Jimenez</u> v. <u>Walker</u>, we recently made clear that when a state court rejects a

petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the

adjudication rested on the merits."). Of course, "[i]f there is no [state court] adjudication on the

merits [and no procedural bar], then the pre-AEDPA, <u>de novo</u> standard of review applies." <u>Cotto</u>

v. <u>Herbert</u>, 331 F.3d 217, 230 (2d Cir. 2003); <u>see also</u> <u>Wilson</u> v. <u>Mazzuca</u>, 570 F.3d at 500 n.8;

<u>Jimenez</u> v. <u>Walker</u>, 458 F.3d at 145 n.17.

Finally, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); <u>accord</u>, <u>e.g.</u>, <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246-47; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 220. "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181 (quoting § 2254(e)(1)); <u>accord</u>, <u>e.g.</u>, <u>Brown</u> v. <u>Alexander</u>, 543 F.3d at 100; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246-47.

## II.   COLON'S MIRANDA CLAIM LACKS MERIT

Colon's first habeas claim asserts that he was subject to "custodial interrogation without <u>Miranda</u> warnings." (<u>See</u> page 1 above.) Justice Kahn denied Colon's pretrial suppression motion. (<u>See</u> pages 16-17 above.) Justice Kahn found that the "evidence . . . demonstrated beyond a reasonable doubt that [Colon] was not in custody prior to 11:45 a.m." on April 26, 2002, when Colon was informed of, and voluntarily waived, his <u>Miranda</u> rights. (<u>See</u> page 16 above.) Although during the interview between 11:45 a.m. and 1:20 p.m. Colon indicated to Detective Mendez a "desire to avoid" the "embarrassing topic" of his purported extramarital affair with Castano, Justice Kahn held that this was best understood as an effort to "exclude certain areas of questions, and not as an unequivocal and unqualified invocation of his right to remain silent." (<u>See</u> pages 16-17 above.) In the alternative, Justice Kahn found that the break between Colon's statement to Detective Mendez

culminating in his 1:20 p.m. written statement and the 8:05 p.m. videotaped statement was "sufficiently pronounced" to insulate the later statement from any taint. (See page 17 above.)

The First Department also rejected Colon's Miranda claims:

> The [hearing] court properly denied [Colon's] motion to suppress statements. The People established that the statements defendant made prior to Miranda warnings were not the product of custodial interrogation, because a reasonable innocent person in defendant's position would not have thought he was in custody. [Colon] voluntarily accompanied the police to the precinct, where he was expressly told he was not under arrest and was free to leave. Although he remained there over an extended period of time and was questioned with increasing intensity, he was never handcuffed or otherwise restrained, he was left alone and unguarded in an unlocked interview room for significant periods of time, and he was permitted to go to the bathroom unescorted. The fact that the police expressed skepticism about [Colon's] story did not render the questioning custodial. "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." Furthermore, it was [Colon] who initiated the conversation with a detective, whom he knew from the neighborhood, in which he first admitted having had sex with the elderly victim on the day of the murder. The detective immediately stopped the conversation and, after Miranda warnings were administered, [Colon] waived his rights and gave a written statement implicating himself in the murder.

People v. Colon, 54 A.D.3d 621, 622, 864 N.Y.S.2d 14, 15 (1st Dep't 2008) (citations omitted). The First Department further held the videotaped statement sufficiently attenuated from the prior statements: "Following a 6 1/2-hour break, and after readministration of warnings, [Colon] made a videotaped confession to two assistant district attorneys. The evidence also supports the hearing court's finding that the videotaped statement was sufficiently attenuated from the earlier police questioning to remove any possible taint arising from any prior constitutional violation, and render the videotape independently admissible." People v. Colon, 54 A.D.3d at 622, 864 N.Y.S.2d at 15.

A.      **Miranda v. Arizona:  Background**

Voluntary statements remain a proper element in law enforcement.  Miranda v.
Arizona, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630 (1966).

> Any statement given freely and voluntarily without any compelling influences is, of
> course, admissible in evidence. . . .  There is no requirement that police stop a person
> who enters a police station and states that he wishes to confess to a crime, or a person
> who calls the police to offer a confession or any other statement he desires to make.
> Volunteered statements of any kind are not barred by the Fifth Amendment.

Id. (fn. omitted); see also, e.g., United States v. Washington, 431 U.S. 181, 187, 97 S. Ct. 1814, 1818

(1977).  But when an individual is taken into custody or otherwise deprived of his freedom by the

authorities in any significant way and is subjected to questioning, the privilege against self-

incrimination is jeopardized, and the now-familiar Miranda warnings must be given.  Miranda v.

Arizona, 384 U.S. at 478, 86 S. Ct. at 1630.

Prior to Miranda, the Supreme Court utilized "due process jurisprudence . . . to

exclude confessions that were obtained involuntarily."  Dickerson v. United States, 530 U.S. 428,

434, 120 S. Ct. 2326, 2331 (2000).  Because of the "coercion inherent in custodial interrogation,"

the Supreme Court in its well-known decision in Miranda v. Arizona "laid down 'concrete

constitutional guidelines for law enforcement agencies and courts to follow.'"  Dickerson v. United

States, 530 U.S. at 435, 120 S. Ct. at 2331 (quoting Miranda v. Arizona, 384 U.S. at 442, 86 S. Ct.

at 1611).  As the Supreme Court summarized in Dickerson in reaffirming Miranda in 2000:

> Those guidelines established that the admissibility in evidence of any statement given
> during custodial interrogation of a suspect would depend on whether the police
> provided the suspect with four warnings.  These warnings (which have come to be
> known colloquially as "Miranda rights") are: a suspect "has the right to remain silent,
> that anything he says can be used against him in a court of law, that he has the right

to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

Dickerson v. United States, 530 U.S. at 435, 120 S. Ct. at 2331 (quoting Miranda v. Arizona, 384 U.S. at 479, 86 S. Ct. at 1630). The Miranda warnings are familiar to everyone from watching television or movies: "Miranda has become embedded in routine police practice to the point where the warnings have become part of our national culture." Dickerson v. United States, 530 U.S. at 443, 120 S. Ct. at 2336.

It goes without saying that statements obtained in violation of Miranda generally must be suppressed. See, e.g., Missouri v. Seibert, 542 U.S. 600, 608, 124 S. Ct. 2601, 2608 (2004) ("Miranda conditioned the admissability at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained."); Dickerson v. United States, 530 U.S. at 443-44, 120 S. Ct. at 2336 ("our subsequent cases have . . . reaffirm[ed] the [Miranda] decision's core ruling that unwarned statements may not be used as evidence in the prosecution's case in chief"); Oregon v. Elstad, 470 U.S. 298, 317, 105 S. Ct. 1285, 1297 (1985) ("When police ask questions of a suspect in custody without administering the required warnings, Miranda dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief.").[21/]

---

[21/] See also, e.g., Georgison v. Donelli, 588 F.3d 145, ___, 2009 WL 4546349 at *9 (2d Cir. 2009) ("If a suspect is not provided with Miranda warnings, 'the prosecution is barred from using statements obtained during the interrogation to establish its case in chief.'"); United States v. Newton, 369 F.3d 659, 668 (2d Cir.) ("If a suspect is not [given Miranda warnings], (continued...)

### 1.    The "In Custody" Requirement

"A suspect is entitled to <u>Miranda</u> warnings only if he or she is interrogated while 'in custody.'" <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d 175, 181 (2d Cir.), <u>cert. denied</u>, 540 U.S. 1091, 124 S. Ct. 962 (2003); <u>accord</u>, <u>e.g.</u>, <u>Stansbury</u> v. <u>California</u>, 511 U.S. 318, 322, 114 S. Ct 1526, 1528 (1994) ("An officer's obligation to administer <u>Miranda</u> warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'") (quoting <u>Oregon</u> v. <u>Mathiason</u>, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977)).[22/]

---

[21/]    (...continued)
the prosecution is barred from using statements obtained during the interrogation to establish its case in chief."), <u>cert. denied</u>, 543 U.S. 947, 125 S. Ct. 371 (2004); <u>United States</u> v. <u>Gaines</u>, 295 F.3d 293, 297 (2d Cir. 2002) ("<u>Miranda</u> instructs generally that an uncounseled statement made by a defendant during custodial interrogation should be suppressed from use by the government in its case-in-chief unless the prosecution proves that the suspect voluntarily waived his right to counsel and privilege against self-incrimination."); <u>United States</u> v. <u>Mathurin</u>, 148 F.3d 68, 69 (2d Cir. 1998); <u>United States</u> v. <u>Morales</u>, 788 F.2d 883, 885 (2d Cir. 1986) ("It is axiomatic that a statement obtained in violation of <u>Miranda</u> is ordinarily inadmissible at trial."); <u>Harris</u> v. <u>Woods</u>, 05 Civ. 5582, 2006 WL 1140888 at *17 (S.D.N.Y. May 01, 2006) (Peck, M.J.), <u>report & rec. adopted</u>, 2006 WL 1975990 (S.D.N.Y. July 10, 2006); <u>Curry</u> v. <u>Burge</u>, 03 Civ. 901, 2004 WL 2601681 at *14 (S.D.N.Y. Nov. 17, 2004) (Peck, M.J.), <u>report & rec. adopted</u>, 2005 WL 106490 (S.D.N.Y. Jan. 19, 2005); <u>Maldonado</u> v. <u>Greiner</u>, 01 Civ.799, 2003 WL 22435713 at *19 (S.D.N.Y. Oct. 28, 2003) (Peck, M.J.).

[22/]    <u>See also</u>, <u>e.g.</u>, <u>Georgison</u> v. <u>Donelli</u>, 588 F.3d 145, ___, 2009 WL 4546349 at *9 (2d Cir. 2009) ("<u>Miranda</u>'s warning requirements . . . apply only to 'custodial interrogation.'"); <u>United States</u> v. <u>Titemore</u>, 437 F.3d 251, 260 (2d Cir. 2006) ("For <u>Miranda</u> to apply, the defendant must be in custody."); <u>Rosa</u> v. <u>McCray</u>, 396 F.3d 210, 221 (2d Cir.) ("[T]he prophylactic protections of <u>Miranda</u> . . . are designed to protect a suspect only during investigative custodial interrogation.") <u>cert. denied</u>, 546 U.S. 889, 126 S. Ct. 215 (2005); <u>United States</u> v. <u>Newton</u>, 369 F.3d 659, 669 (2d Cir.) ("<u>Miranda's</u> warning requirements apply only to 'custodial interrogations.'"), <u>cert. denied</u>, 543 U.S. 947, 125 S. Ct. 371 (2004); <u>United States</u> v. <u>Badmus</u>, 325 F.3d 133, 138 (2d Cir. 2003) ("<u>Miranda</u> warnings must be given when a (continued...)

"A court evaluating whether a person is in custody for <u>Miranda</u> purposes must consider 'the circumstances surrounding the interrogation; and . . . [whether] given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" <u>United States</u> v. <u>Romaszko</u>, 253 F.3d 757, 760 (2d Cir. 2001) (quoting <u>Thompson</u> v. <u>Keohane</u>, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995)); <u>accord</u>, <u>e.g.</u>, <u>Yarborough</u> v. <u>Alexander</u>, 541 U.S. 652, 663, 124 S. Ct. 2140, 2149 (2004); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181-82.[23/]

---

[22/]   (...continued)
person is interrogated while 'in custody.'"); <u>United States</u> v. <u>Mazzeo</u>, No. 99-1223, 205 F.3d 1326 (table), 2000 WL 232032 at *1 (2d Cir. Jan. 21, 2000) ("A criminal suspect must be informed of his or her rights only when the suspect is subjected to custodial interrogation."); <u>Tankleff</u> v. <u>Senkowski</u>, 135 F.3d 235, 242 (2d Cir. 1998) ("A suspect is entitled to <u>Miranda</u> warnings only if he or she is interrogated while 'in custody.'"); <u>United States</u> v. <u>Kirsh</u>, 54 F.3d 1062, 1067 (2d Cir. 1995) ("<u>Miranda</u> warnings are not required unless law enforcement agents interrogate a person who is in custody."), <u>cert. denied</u>, 516 U.S. 927, 116 S. Ct. 330 (1995); <u>Harris</u> v. <u>Woods</u>, 05 Civ. 5582, 2006 WL 1140888 at *17 (S.D.N.Y. May 1, 2006) (Peck, M.J.) ("A suspect is entitled to <u>Miranda</u> warnings only if he or she is interrogated while '"in custody."'"), <u>report & rec. adopted</u>, 2006 WL 1975990 (S.D.N.Y. July 10, 2006); <u>Maldonado</u> v. <u>Greiner</u>, 01 Civ.799, 2003 WL 22435713 at *19 (S.D.N.Y. Oct. 28, 2003) (Peck, M.J.) ("A suspect is entitled to <u>Miranda</u> warnings only if he or she is interrogated while '"in custody."'"); <u>Vega</u> v. <u>Artuz</u>, 97 Civ. 3775, 2002 WL 252764 at *9 (S.D.N.Y. Feb. 20, 2002) ("[T]he provision of <u>Miranda</u> rights is not required unless the person being questioned is in custody."); <u>Hurdle</u> v. <u>Hoke</u>, 86 Civ. 8749, 1990 WL 52126 at *2 (S.D.N.Y. Apr. 17, 1990) (Where "[p]etitioner was not under custodial interrogation . . . no <u>Miranda</u> warnings were required."), <u>aff'd</u>, No. 90-2275, 930 F.2d 908 (table) (2d Cir. 1991).

[23/]   See also, <u>e.g.</u>, <u>Georgison</u> v. <u>Donelli</u>, 2009 WL 4546349 at *9 ("'Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'"); <u>Ortiz</u> v. <u>N.Y.S. Parole in Bronx, N.Y.</u>, 586 F.3d 149, 157 (2d Cir. 2009) ("[T]he legal standard for determining whether a suspect is in 'custody' for purposes of <u>Miranda</u> v. <u>Arizona</u> [asks,] 'given [the (continued...)

The "in custody" test utilizes an objective standard:

> The test for custody is an objective one: "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest."
>
>     . . .
>
> [I]t makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the Miranda inquiry is at an end; the challenged interrogation did not require advice of rights. On the other hand, if a reasonable person would not have thought himself free to leave, additional analysis is required because . . . not every seizure constitutes custody for the purposes of Miranda. In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. Only if the answer to this second question is yes was the person "'in custody' for practical purposes," and "entitled to the full panoply of protections prescribed by Miranda."

United States v. Newton, 369 F.3d at 671, 672 (citations omitted); accord, e.g., Tankleff v.

Senkowski, 135 F.3d at 243-44; see e.g., Georgison v. Donelli, 2009 WL 4546349 at *10; Hicks v.

---

[23/]    (...continued)
circumstances surrounding an interrogation], would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.") (citations omitted); United States v. Newton, 369 F.3d at 671-72; United States v. Badmus, 325 F.3d at 138; Nova v. Bartlett, 211 F.3d 705, 707 (2d Cir. 2000) ("[W]hether a reasonable person in [petitioner's] situation would have felt free to terminate the interrogation and leave [is] the ultimate 'in custody' determination for purposes of Miranda."); United States v. Mazzeo, 2000 WL 232032 at *1 ("The two-part test for determining whether a person is in custody is firmly established. Courts first consider the circumstances surrounding the interrogation, and then determine whether a reasonable person would have felt at liberty to end the interrogation and leave under those circumstances."); Tankleff v. Senkowski, 135 F.3d at 243 ("[C]ustody exists for Miranda purposes if a reasonable person in [the suspect's] position would 'have felt he or she was not at liberty to terminate the interrogation and leave.'") (quoting Thompson v. Keohane, 516 U.S. at 112, 116 S. Ct. at 465); United States v. Kirsh, 54 F.3d at 1067; United States v. Lifshitz, 03 Cr. 572, 2004 WL 2072468 at *6 (S.D.N.Y. Sept. 15, 2004); Maldonado v. Greiner, 2003 WL 22435713 at *19; United States v. Troche, 181 F. Supp. 2d 340, 349 (S.D.N.Y. 2002); cases cited below.

City of Buffalo, 124 Fed. Appx. 20, 24 (2d Cir. 2004). Determining whether the subject was in custody therefore "'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" Vega v. Artuz, 2002 WL 252764 at *9 (quoting Stansbury v. California, 511 U.S. at 323, 114 S. Ct. at 1529).

Factors relevant to the custody inquiry include: "whether a suspect is or is not told that [he or] she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." Tankleff v. Senkowski, 135 F.3d at 244 (citations omitted).[24] The Second Circuit has held that "[t]o be considered 'in custody' a defendant must have 'understood himself to be subject to restraints comparable to those associated with a formal arrest.'" United States v. Remache, No. 99-1113, 201 F.3d 433 (table), 1999 WL 1212535 at *1 (2d Cir. Dec. 15, 1999) (quoting United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992)), cert. denied, 529 U.S. 1080, 120 S. Ct. 1702 (2000). "An accused is in custody when, even 'in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused

---

[24]     Accord, e.g., United States v. Satchel, 06 Cr. 790, 2007 WL 1411608 at *3 (S.D.N.Y. May 11, 2007); United States v. Venkataram, 06 Cr. 102, 2007 WL 102102 at *14 (S.D.N.Y. Jan. 10, 2007); Harris v. Woods, 2006 WL 1140888 at *18; United States v. Lifshitz, 2004 WL 2072468 at *6; Maldonado v. Greiner, 2003 WL 22435713 at *19; Vega v. Artuz, 2002 WL 252764 at *10; United States v. Troche, 181 F. Supp. 2d at 349; United States v. McCallister, 00 Cr. 482, 2001 WL 11068 at *2 (S.D.N.Y. Jan. 4, 2001).

to leave.'" United States v. Kirsh, 54 F.3d at 1067 (quoting Campaneria v. Reid, 891 F.2d 1014, 1021 n.1 (2d Cir. 1989), cert. denied, 499 U.S. 949, 111 S. Ct. 1149 (1991)).[25/]

The Supreme Court has "made it clear that Miranda warnings are not required simply because 'the questioning took place in a "coercive environment,"'" such as the police station. Cruz v. Miller, 255 F.3d 77, 81-82 (2d Cir. 2001) (quoting Oregon v. Mathiason, 429 U.S. at 495, 97 S. Ct. at 714) (Miranda warnings not required "simply because the questioning takes place in the station house;" suspect who came to police station voluntarily and questioned in a closed room not "in custody"); see, e.g., United States v. Wallace, 178 Fed. Appx. 76, 79-80 (2d Cir.) ("[T]here is no requirement that the Miranda warning be given merely because the interview takes place at the police station." Where suspect was interviewed at a police station in a room with an open door, and told that he was free to leave at any time, he was not in custody.), cert. denied, 599 U.S. 1011, 127 S. Ct. 534 (2006); Machicote v. Ercole, 06 Civ. 13320, 2008 WL 169348 at *9 (S.D.N.Y. Jan. 18, 2008) (prisoner incarcerated on unrelated charges interviewed regarding murder in an interview room, not a prison cell, and not handcuffed or shackled or guarded by the officer who had escorted him from his cell, was not in custody); Harris v. Woods, 2006 WL 1140888 at *26 (suspect interviewed at police station in a fifteen by eight foot interview room, the door to which was open a crack and was never locked, was not in custody); United States v. Al-Marri, 230 F. Supp. 2d 535, 543 (S.D.N.Y. 2002) (suspect interviewed at FBI office in unlocked interview room was not in custody); United

---

[25/]    Accord, e.g., United States v. Falso, 293 Fed.Appx. 838, 839 (2d Cir. 2008), cert. denied, 130 S. Ct. 154 (2009); United States v. Badmus, 325 F.3d at 138; see also, e.g., United States v. Mitchell, 966 F.2d at 98 (Custody inquiry "focuses upon the presence or absence of affirmative indications that the defendant was not free to leave.").

States v. Rogers, 99 Cr. 710, 2000 WL 101235 at *12 (S.D.N.Y. Jan. 27, 2000) ("In the context of determining whether an individual is in custody under the Fifth Amendment, the courts have long recognized that the setting of a police station or a police interrogation room, without more, is not so coercive as to preclude a reasonable person from feeling free to leave.") (citing Oregon v. Mathiason), aff'd, 225 F.3d 647 (2d Cir. 2000).

When the police have an individual in custody, "giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." Missouri v. Seibert, 542 U.S. 600, 608-09, 124 S. Ct. 2601, 2608 (2004).

"Because 'the custody test is general,' the state court's application of federal law need only fit[] within the matrix of [the Supreme] Court's prior decisions" for AEDPA purposes. Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d at 157 (quoting Yarborough v. Alexander, 541 U.S. at 665, 124 S. Ct. at 2143).

### 2. The Treatment of Subsequent Mirandized Statements After A Prior Unwarned Statement: The Elstad and Seibert Decisions

The Supreme Court has made clear that even if a defendant's initial statement is considered "incriminating and obtained in violation of the Miranda rule, that does not render his later, fully warned confessions inadmissible." Nova v. Bartlett, 211 F.3d 705, 708 (2d Cir. 2000) (citing Oregon v. Elstad, 470 U.S. 298, 311-14, 105 S. Ct. 1285, 1294-96 (1985)). "[T]he Supreme Court expressly rejected the 'cat out of the bag' theory under which, once an incriminating statement

has been made, no subsequent confession can be truly voluntary." <u>Nova</u> v. <u>Bartlett</u>, 211 F.3d at 708 (citing <u>Oregon</u> v. <u>Elstad</u>, 470 U.S. at 318, 105 S. Ct. at 1297-98).

In <u>Oregon</u> v. <u>Elstad</u>, the Supreme Court held that where a defendant makes a pre-<u>Miranda</u> statement and then a post-<u>Miranda</u> statement, the latter is admissible if "knowingly and voluntarily made":

> It is an unwarranted extension of <u>Miranda</u> to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. <u>Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made</u>.
>
> . . . .
>
> We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. <u>A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement</u>. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.
>
> . . . .
>
> Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of <u>Miranda</u>, was voluntary. <u>The relevant inquiry is whether, in fact, the second statement was also voluntarily made</u>. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of <u>Miranda</u> and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied . . . by barring use of the unwarned statement in the case in chief. No

> further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver.  <u>We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings</u>.

<u>Oregon</u> v. <u>Elstad</u>, 470 U.S. at 309, 314, 318, 105 S. Ct. at 1293, 1296, 1297-98 (emphasis added & fn. omitted); <u>see</u>, <u>e.g.</u>, <u>Walker</u> v. <u>James</u>, 116 Fed. Appx. 295, 298 (2d Cir. 2004) ("'subsequent administration of <u>Miranda</u> warnings . . . ordinarily should suffice to remove the conditions that precluded admission of [an] earlier statement.'") (quoting <u>Oregon</u> v. <u>Elstad</u>); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d 175, 183 (2d Cir.) ("'absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.'") (quoting <u>Oregon</u> v. <u>Elstad</u>), <u>cert. denied</u>, 540 U.S. 1091, 124 S. Ct. 962 (2003); <u>Casellas</u> v. <u>McGinnis</u>, No. 99-2127, 199 F.3d 1321 (table), 1999 WL 980948 at *3 (2d Cir. 1999) ("[I]t is not enough to say that the first confession was obtained in violation of <u>Miranda</u>[,] [f]or the later confessions would still be admissible under <u>Elstad</u> unless the circumstances surrounding this first statement entailed coercion so great that there could not have been a voluntary waiver of rights as to the subsequent confessions."), <u>cert. denied</u>, 529 U.S. 1091, 120 S. Ct. 1729 (2000).[26/]

---

[26/]  <u>See also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Capers</u>, 06 Cr. 266, 2007 WL 959300 at *11 (S.D.N.Y. Mar. 29, 2007) ("'absent deliberately coercive or improper tactics in obtaining the initial statement, the <u>mere fact</u> that a suspect has made an unwarned admission does not warrant a <u>presumption</u> of compulsion.'") (quoting <u>Oregon</u> v. <u>Elstad</u>); <u>Hotchkiss</u> v. <u>Walsh</u>, 00 Civ. 5518, 2004 WL 2721943 at *10 (S.D.N.Y. Nov. 29, 2004) (Swain, D.J.) ("[E]ven if [an initial] Inculpatory Statement violated [petitioner's] rights, this does not mean that his [subsequent] Videotaped Statement was inadmissible."); <u>United States</u> v. <u>Orellana-Osorio</u>, No. 95-1541,

(continued...)

In <u>Missouri</u> v. <u>Seibert</u>, 542 U.S. 600, 124 S. Ct. 2601 (2004), the Supreme Court re-examined <u>Elstad</u> in a case where the police intentionally conducted an un-<u>Mirandized</u> custodial interrogation in order to obtain a full confession, and then gave <u>Miranda</u> warnings to secure a <u>Mirandized</u> reiteration of the earlier confession.  The Supreme Court held that this "question-first" interrogation technique, by which police intentionally elicited a complete and detailed pre-warning confession, then subsequently administered <u>Miranda</u> warnings and led the suspect through the identical confession, overcame the suspect's waiver of his rights and was a violation of the suspect's Fifth Amendment rights.  <u>Id</u>. at 604, 611, 124 S. Ct. at 2605, 2610.

According to the plurality opinion of Justice Souter, joined by Justices Stevens, Ginsburg and Breyer, "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as <u>Miranda</u> requires."  <u>Id</u>. at 611-12, 124 S. Ct. at 2610.  "If yes, a court can take up the standard issues of voluntary waiver and voluntary statement; if no, the subsequent statement is inadmissible for want of adequate <u>Miranda</u> warnings, because the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning."  <u>Id</u>. at 612 n.4, 124 S. Ct.

---

<u>26</u>/   (...continued)
101 F.3d 1393 (table), 1996 WL 460797 at *2 (2d Cir. Aug. 14, 1996) ("When an unwarned admission has been made without coercion, the admissibility of additional statements, made after the subsequent administration of <u>Miranda</u> warnings, turns on whether these latter statements were also freely given."), <u>cert. denied</u>, 519 U.S. 1069, 117 S. Ct. 713 (1997); <u>Vasquez</u> v. <u>Senkowski</u>, 54 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999); <u>United States</u> v. <u>Ford</u>, 96 Cr. 672, 1997 WL 538813 at *10 (S.D.N.Y. Aug. 29, 1997) ("[T]he fact that the Defendants were subjected to some questioning prior to the reading of their <u>Miranda</u> rights does not render inadmissible the statements made by the Defendants after the reading of their <u>Miranda</u> rights.").

at 2610 n.4. "[I]t is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." Id. at 613, 124 S. Ct. at 2610.

The plurality opinion distinguished Elstad: "The contrast between Elstad and this case [i.e., Seibert] reveals a series of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id. at 615, 124 S. Ct. at 2612.[27]

Justice Kennedy concurred with the plurality's judgment, but differed with its approach. Id. at 618, 124 S. Ct. at 2614 (Kennedy, J., concurring). Justice Kennedy stated:

> I would apply a narrower test [than the multifactor plurality test] applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning.
>
> The admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed. If the deliberate

---

[27] Justice Breyer, joining and concurring with the plurality's opinion, suggested that "the plurality's approach in practice will function as a 'fruits' test," id. at 617, 124 S. Ct. at 2613 (Breyer, J., concurring), and concluded that "[c]ourts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." Id. Effective Miranda warnings "will occur only when certain circumstances – a lapse in time, a change in location or interrogating officer, or a shift in the focus of the questioning – intervene between the unwarned questioning and any postwarning statement." Id. at 618, 124 S. Ct. at 2613.

two-step strategy has been used, post warning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made."

Id. at 622, 124 S. Ct. at 2616 (Kennedy, J., concurring).

The Second Circuit has followed other circuits in limiting Seibert to cases where the police adopted a deliberate two-tiered interrogation strategy, and otherwise continues to utilize the Elstad test. E.g., United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007) ("We now join our sister circuits in holding that Seibert lays out an exception to Elstad for cases in which a deliberate, two-step strategy was used by law enforcement to obtain the postwarning confession. We also find, in the present case, that such a strategy was not employed. Accordingly, the holding in Elstad applies."), cert. denied, 128 S. Ct. 1066 (2008); see, e.g., United States v. Hernandez, 06 Cr. 46, 2006 WL 2242318 at *5-6 (S.D.N.Y Aug. 3, 2006) (Lynch, D.J.) (Where "the second statement was made not as part of a virtually continuous sequence of questioning in the same location, but in a different location, after a considerable lapse of time . . . . [i.e.,] after a break of five or six hours, . . . and was preceded not merely by another set of oral warnings, but by the ceremony of requiring [defendant] to read a written statement of the warnings, and initial and sign the advice of rights form to acknowledge his understanding . . . .[, and where the agent's testimony] makes clear that the agents' strategy here was premised on the good-faith belief that [defendant] was not in custody and that warnings were therefore not required[,]" the court found that "[t]his case is closer to Elstad than to Seibert.").[28]

---

[28]    See also, e.g., United States v. Owens, 08 Cr. 534, 2008 WL 4865205 at *2 (S.D.N.Y.
(continued...)

**B.      Colon's Statements Were Not The Product Of Custodial Interrogation**

      **1.      The State Courts' Determination of the Facts Surrounding Colon's Statements to the Police Is Entitled to a Presumption of Correctness**

      Pursuant to the AEDPA, "'a determination of a factual issue made by a State court

shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the

---

28/      (...continued)
Nov. 7, 2008) ("[T]he Supreme Court in <u>Seibert</u> . . . carved out an exception to [the <u>Elstad</u>] rule where law enforcement employs a deliberate, two-step interrogation strategy to undermine <u>Miranda</u>.); <u>United States</u> v. <u>Capers</u>, 2007 WL 959300 at *11 ("[T]his Court believes that Judge Lynch's approach in <u>Hernandez</u> is preferable: to consider the facts of present case-making 'a case-by-case determination based upon the totality of the circumstances,' – in the light of the facts in both <u>Elstad</u> and <u>Seibert</u>.") (citations omitted); <u>United States</u> v. <u>McFarland</u>, 424 F. Supp. 2d 427, 445 (N.D.N.Y. Mar. 23, 2006) ("'<u>Seibert</u> does not alter the fundamental <u>Elstad</u> inquiry: namely, whether under the totality of the circumstances, an accused's subsequent statements were made following a knowing and voluntary waiver of rights.'" "Clearly, the police attempted to use [defendant's] first unwarned statement to induce the second. . . . [H]owever, this is not an 'ask first, <u>Mirandize</u> second' case.  Almost two years elapsed between the first round of questioning and the second, and the police personnel were different."); <u>Duncan</u> v. <u>Fischer</u>, 410 F. Supp. 2d 101, 110 (E.D.N.Y. 2006) (where there was "no indication that the police in this case adopted any strategy to avoid <u>Miranda</u>," <u>Seibert</u> was not applicable); <u>United States</u> v. <u>Miller</u>, 382 F. Supp. 2d 350, 375-76 (N.D.N.Y. 2005) ("<u>Seibert</u> limits the application of <u>Elstad</u>, but not the test." A "spontaneous and not prompted" statement that "bore no rational relationship to the impermissible question that preceded it" did not require exclusion of subsequent <u>Mirandized</u> statements that were not "part of a coordinated and continuous interrogation designed to thwart <u>Miranda</u>" and "were not tainted by the inadmissible" prior statement.); <u>United States</u> v. <u>Cohen</u>, 372 F. Supp. 2d 340, 354-55 (E.D.N.Y. 2005) ("The aims of the analyses [of the plurality opinion and Justice Kennedy's concurrence] are similar, but neither a logical subset of the other." "Only a recognition that deliberate circumvention of <u>Miranda</u> is unconstitutional, but for different reasons and after separate analyses, binds the plurality and Justice Kennedy's concurrence." "A fair characterization [of the <u>Seibert</u> holding] is that <u>Elstad</u> does not control all situations of question-first interrogations; that sometimes warned confessions related to previous unwarned confessions must be suppressed."); <u>Vachet</u> v. <u>West</u>, No. 04-CV-3515, 2005 WL 740640 at *8 (E.D.N.Y. Mar. 24, 2005) (emphasizing that "this is not a case where the police procured a detailed confession before giving <u>Miranda</u> warnings, only to have [defendant] repeat those statements after the warnings were given").

presumption of correctness by clear and convincing evidence.'" <u>Boyette</u> v. <u>Lefevre</u>, 246 F.3d 76, 88

(2d Cir. 2001) (quoting 28 U.S.C. § 2254(e)(1)). As the Second Circuit has stated, a federal habeas

court should

> review the state court's findings only to determine whether they were unreasonable
> in light of the evidence presented, 28 U.S.C. § 2254(d)(2), or whether the
> presumption that they are correct was rebutted by "clear and convincing" evidence,
> 28 U.S.C. § 2254(e)(1). . . . In accordance with 28 U.S.C. § 2254, as modified by
> AEDPA, our review of the state court determinations of facts is limited to an inquiry
> into whether the conclusion of the state trial court was unreasonable based on the
> evidence presented and whether petitioner has presented evidence in the District
> Court that clearly and convincingly rebuts the presumption that the state court's
> factual findings are correct.

<u>Channer</u> v. <u>Brooks</u>, 320 F.3d 188, 195-96 (2d Cir. 2003); <u>accord</u>, <u>e.g.</u>, <u>Miller-El</u> v. <u>Cockrell</u>, 537

U.S. 322, 339, 123 S. Ct. 1029, 1041 (2003) ("Factual determinations by state courts are presumed

correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated

on the merits in a state court and based on a factual determination will not be overturned on factual

grounds unless objectively unreasonable in light of the evidence presented in the state-court

proceeding, § 2254(d)(2)."); <u>Bartley</u> v. <u>Senkowski</u>, 144 Fed. Appx. 151, 154 (2d Cir.) (New York

court's findings of fact are presumed to be correct and petitioner has the burden of rebutting this

presumption by clear and convincing evidence), <u>cert. denied</u>, 546 U.S. 1078, 126 S. Ct. 835 (2005);

<u>Rosa</u> v. <u>McCray</u>, 396 F.3d 210, 220 (2d Cir.) (state court's determination of a factual issue is

presumed to be correct, and is unreasonable only where the petitioner meets the burden of rebutting

the presumption of correctness by clear and convincing evidence), <u>cert. denied</u>, 546 U.S. 839, 126

S. Ct. 215 (2005); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d 175, 181 (2d Cir.) (determination of a factual issue

made by state court is presumed to be correct, and petitioner bears the burden of rebutting the

presumption of correctness by clear and convincing evidence), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003); Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003) ("Under AEDPA, a state court's factual findings enjoy a presumption of correctness and may not be disturbed except upon a showing of 'clear and convincing evidence.'"); Davis v. Kelly, 316 F.3d 125, 127 (2d Cir.) ("Under the AEDPA, we must accept [the state court's] finding of fact unless it is controverted by 'clear and convincing evidence.'"), cert. denied, 540 U.S. 958, 124 S. Ct. 414 (2003); LanFranco v. Murray, 313 F.3d 112, 117 (2d Cir. 2002) ("In reviewing habeas petitions, we must presume the state court's findings of fact are correct, unless the petitioner meets 'the burden of rebutting th[is] presumption of correctness by clear and convincing evidence.") (brackets in original); Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) ("We presume that the state court's factual findings are correct unless they are rebutted by clear and convincing evidence."); Brown v. Artuz, 283 F.3d 492, 498 (2d Cir. 2002) ("[T]he AEDPA instructs that state court findings of fact 'shall be presumed correct,' rebuttable only upon a showing of 'clear and convincing evidence.'") [29/]

---

[29/]    See also, e.g., Bynum v. Duncan, 02 Civ. 2124, 2003 WL 296563 at *6 (S.D.N.Y. Feb. 12, 2003) ("Under AEDPA, this Court must presume the state court's factual findings to be correct and may overturn those findings only if the petitioner offers clear and convincing evidence of their incorrectness."); Fabian v. Herbert, 00 Civ. 5515, 2003 WL 173910 at *5 (S.D.N.Y. Jan. 23, 2003) ("In reviewing state court factual determinations, the Court 'must apply a presumption of correctness . . . unless rebutted by clear and convincing evidence.'") (quoting Rodriguez v. Bennett, 98 Civ. 580, 1998 WL 765180 at *3 (S.D.N.Y. Nov. 2, 1998)); Marsh v. Ricks, 02 Civ. 3449, 2003 WL 145564 at *2 (S.D.N.Y. Jan. 17, 2003) ("State court fact findings underlying habeas claims enjoy a strong presumption of correctness that can only be rebutted by 'clear and convincing evidence.'"); Brown v. Costello, 00 Civ. 4734, 2003 WL 118499 at *8 (S.D.N.Y. Jan. 13, 2003) ("State court factual determinations must be presumed correct unless the petitioner is able to rebut them with clear and convincing evidence."); Grate v. Stinson, 224 F. Supp. 2d 496, 501 (E.D.N.Y. 2002)
(continued...)

Whether Colon was "coerced" into giving his confessions by police is a matter of historical fact subject to the presumption of correctness under 28 U.S.C. § 2254(e)(1). See, e.g., Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995) (The inquiry into the "circumstances surrounding the interrogation . . . is distinctly factual."); Alexandre v. Senkowski, 126 Fed. Appx. 7, 12 (2d Cir. 2005) (state determinations of subsidiary factual questions underlying the question of voluntariness are subject to AEDPA presumption of correctness); Tankleff v. Senkowski, 135 F.3d 235, 243 (2d Cir. 1998) (The inquiry into the circumstances surrounding the interrogation is "purely factual, and the state court's answer to it is afforded a presumption of correctness . . ."); Brown v. Purge, No. 05-CV-3631, 2009 WL 3837308 at *5 (E.D.N.Y. Nov. 17, 2009) ("When reviewing a habeas petition, [t]he factual findings of the New York Courts are presumed to be correct[,] with regard to recitals of external events and the credibility of the witnesses narrating them. Thus, the state court's determination of whether the police engaged in the intimidation tactics alleged by the defendant [is] entitled to the presumption of correctness.") (citations & quotations omitted); McKinney v. Burge, No. 04-CV-1150, 2009 WL 666396 at *17 (N.D.N.Y. Mar. 10, 2009) ("The inquiry into the circumstances surrounding the confession, including the length and circumstances of the interrogation and a defendant's prior experience with the legal system, is 'purely factual, and the state court's answer to it is afforded a presumption of

---

[29]/ (...continued)
(Post-AEDPA, "a federal court conducting a collateral review must still presume state court findings of fact to be correct, 28 U.S.C. § 2254(e), although it is probably harder now [than pre-AEDPA] for a habeas petitioner to overcome this presumption, as the petitioner must now present clear and convincing evidence that the finding of fact was erroneous, id.").

correctness' under 28 U.S.C. § 2254(e)(1)."); <u>Kent</u> v. <u>Smith</u>, No. 05-CV-0785, 2007 WL 2907350 at *6 (N.D.N.Y. Oct. 4, 2007) ("The inquiry into the circumstances surrounding the confession, including the length and circumstances of the interrogation and a defendant's prior experience with the legal system, is 'purely factual, and the state court's answer to it is afforded a presumption of correctness' under 28 U.S.C. § 2254(e)(1)."); <u>Curry</u> v. <u>Burge</u>, 03 Civ. 0901, 2004 WL 2601681 at *15 (S.D.N.Y. Nov. 17, 2004) (Peck, M.J.) ("Whether [petitioner] was 'coerced' into giving his confessions by police who did not honor his right to remain silent is a matter of historical fact subject to the presumption of correctness under 28 U.S.C. § 2254(e)(1)."), <u>report & rec. adopted</u>, 2005 WL 106490 (S.D.N.Y. Jan. 19, 2005); <u>Manzella</u> v. <u>Senkowski</u>, No. 97-CV-921, 2004 WL 1498195 at *24 (W.D.N.Y. July 2, 2004) (The "circumstances surrounding the interrogation . . . inquiry is a question of fact subject to AEDPA's presumption of correctness, which can only be overcome by clear and convincing evidence.") (quotations omitted); <u>Maldonado</u> v. <u>Greiner</u>, 01 Civ. 0799, 2003 WL 22435713 at *22 (S.D.N.Y. Oct. 28, 2003) (Peck, M.J.) (state court factual determination that petitioner was not in custody should be presumed correct); <u>Tibbs</u> v. <u>Greiner</u>, 01 Civ. 4319, 2003 WL 1878075 at *9 (S.D.N.Y. Apr. 16, 2003) (Peck, M.J.) ("Whether [petitioner] was questioned before being advised of his <u>Miranda</u> rights by [police] is a matter of historical fact subject to the presumption of correctness under 28 U.S.C. §2254(e)(1)."); <u>Holland</u> v. <u>Donnelly</u>, 216 F. Supp. 2d 227, 231 (S.D.N.Y. 2002) ("[A]ccount of the events leading up to [petitioner's] confession" were "findings of historical fact [that] must be 'presumed to be correct' for purposes of [habeas]

petition. . . .") (citing 28 U.S.C. § 2254(e)(1) & <u>Boyette</u> v. <u>Lefevre</u>, 246 F.3d at 88), <u>aff'd</u>, 324 F.3d 99 (2d Cir.), <u>cert. denied</u>, 540 U.S. 834, 124 S. Ct. 86 (2003).[30/]

While giving deference to the state court's factual findings, the habeas court has "the responsibility to decide independently of the judgment of the state court whether [petitioner's] confession was unconstitutionally obtained." <u>Graham</u> v. <u>Leonardo</u>, No. 98-2042, 166 F.3d 1200 (table), 1998 WL 852942 at *4 (2d Cir. Dec. 1, 1998), <u>cert. denied</u>, 526 U.S. 1029, 119 S. Ct. 1275 (1999); <u>see</u>, <u>e.g.</u>, <u>Scott</u> v. <u>Fisher</u>, No. 03-CV-6274, — F. Supp. 2d —, 2009 WL 2903585 at *42 (W.D.N.Y. Sept. 10, 2009) ("[T]he voluntariness of a habeas petitioner's confession is a question of law entitled to de novo review by a federal court. Because subsidiary questions (such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and the defendant's familiarity with the <u>Miranda</u> warnings) often require the resolution of conflicting

_____

[30/]     <u>See also</u>, <u>e.g.</u>, <u>Dallio</u> v. <u>Spitzer</u>, 170 F. Supp. 2d 327, 338 (E.D.N.Y. 2001) ("[A] state court's determinations of 'subsidiary questions such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the <u>Miranda</u> warnings' are considered questions of fact, which are entitled to a presumption of correctness under 28 U.S.C. 2254(d).") (citing <u>Miller</u> v. <u>Fenton</u>, 474 U.S. 104, 117, 106 S. Ct. 445, 448 (1985)), <u>aff'd</u>, 343 F.3d 553 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 961, 124 S. Ct. 1713 (2004); <u>Ortiz</u> v. <u>Artuz</u>, 113 F. Supp. 2d 327, 338 (E.D.N.Y. 2000) ("While the voluntariness of a habeas petitioner's confession is a question of law. . . , subsidiary factual questions relevant to this determination are entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). Because subsidiary questions (such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and the defendant's familiarity with the <u>Miranda</u> warnings) often require the resolution of conflicting testimony of police and defendant, the law is clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record. It is a petitioner's burden to overcome the presumption of correctness by showing that the state court's holding was wrong by clear and convincing evidence.") (citations omitted), <u>aff'd</u>, 36 Fed. Appx. 1 (2d Cir.), <u>cert. denied</u>, 536 U.S. 909, 122 S. Ct. 2367 (2002).

testimony of police and defendant, state-court factual determinations on these issues are entitled to the presumption of correctness called for by the federal habeas statute under 28 U.S.C. § 2254(e)(1).") (citations omitted); Bennett v. Poole, No. 04-CV-0014, 2008 WL 3200242 at *18 (W.D.N.Y. Aug. 5, 2008) ("The voluntariness of a confession is a question of law. . . .[but] a state court's factual findings are entitled to a presumption of correctness, 28 U.S.C. 2254(e)(1). . . ."); Ramdeo v. Phillips, 04-CV-1157, 2007 WL 1989469 at *24 (E.D.N.Y. July 9, 2007) ("The voluntariness of a state habeas petitioner's confession is 'a legal question requiring independent federal determination' under the review provisions of § 2254(d)(1).  The findings underlying the State court's voluntariness determination, however, are factual determinations which 'must be "presumed to be correct in a federal habeas corpus proceeding."'  This presumption applies to such determinations as 'the length and circumstances of the interrogation,' and 'whether in fact the police engaged in the intimidation tactics alleged' by the petitioner.  The presumption of correctness may be set aside if 'the material facts were not adequately developed at the State court hearing or . . . the factual determination is not fairly supported by the record,' but the petitioner bears the burden of rebutting the presumption by clear and convincing evidence.") (citations omitted); Kollar v. Smith, 04 Civ. 10175, 2005 WL 1653883 at *7 (S.D.N.Y. July 12, 2005) ("because the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination, we briefly review the circumstances surrounding his statements for constitutional violations in the admission of the evidence.  Nevertheless, the factual questions resolved by the state courts are entitled to the

presumption of correctness dictated by 28 U.S.C. § 2254(d), and the petitioner bears the burden of

rebutting the presumption by clear and convincing evidence.") (citations & quotations omitted).[31]

> **2.** **The State Court Determination That Colon's Initial Statement Was Voluntary and Not the Product of a Custodial Interrogation Must Be Upheld Under The AEDPA Review Standard**

Colon was in custody if, under the circumstances, a reasonable person in Colon's

position "would have understood himself to be subjected to the restraints comparable to those

associated with a formal arrest." United States v. Ali, 68 F.3d 1468, 1472 (2d Cir. 1995) (quotations

omitted); see, e.g., Tankleff v. Senkowski, 135 F.3d 235, 243 (2d Cir. 1998); see also cases cited

above. Courts have looked at various factors in making this determination, including: "whether a

---

[31] See also, e.g., Bruno v. Cunningham, 03 Civ. 937, 2004 WL 2290503 at *9 (S.D.N.Y. Oct. 8, 2004) (citing Miller v. Fenton, 474 U.S. 104, 110, 106 S. Ct. 445, 449 (1985)); Davis v. Johnson, 258 F. Supp. 2d 93, 100 (S.D.N.Y. 2003) (While the "'ultimate issue of voluntariness [of a confession] is a legal question requiring independent federal determination,'" factual questions underlying that legal determination "are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).") (brackets in original) (quoting Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997)); Mackenzie v. Portuondo, 208 F. Supp. 2d 302, 324 (E.D.N.Y. 2002) ("The ultimate question of whether a confession was voluntary or involuntary []is a legal question requiring independent federal determination. Subsidiary factual questions underlying a legal determination, however, are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).") (citations & internal quotations omitted); Basnight v. Keane, No. 99-CV-5907, 2001 WL 901139 at *4 (E.D.N.Y. July 31, 2001) ("While the ultimate question of the voluntariness of such a statement is a matter for independent federal review on a habeas petition, state court determinations of underlying factual questions are entitled to the statutory presumption of correctness."); Richter v. Artuz, 77 F. Supp. 2d 385, 396 (S.D.N.Y. 1999) (Parker, D.J.) ("The Supreme Court has held that 'the ultimate question, whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination.' However, a state court's determinations of subsidiary questions such as the length and circumstances of the interrogation . . . are considered questions of fact, which are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).").

suspect is or is not told that [he or] she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." Tankleff v. Senkowski, 135 F.3d at 244 (citations omitted); see cases cited above.

Many of the facts surrounding Colon's questioning are undisputed. On April 26, 2002, around 3:00 a.m., police officers went to Colon's apartment and indicated that they were interviewing everyone who might have seen Castano the previous day. (See pages 4, 21-22 above.) Colon was "[m]atter of fact" and said that he had "no problem" accompanying them to the 10th Precinct. (See pages 4, 22 above.) A person who voluntarily accompanies the police to the station for questioning, without more, is not in custody. See e.g., California v. Beheler, 463 U.S. 1121, 1122-25, 103 S. Ct. 3517, 3518-20 (1983) (where suspect voluntarily went to the police station, and was not placed under arrest, suspect was not in custody); Oregon v. Mathiason, 429 U.S. 492, 493, 495, 97 S. Ct. 711, 713, 714 (1977) (Where police initiated contact with defendant who agreed to come to the patrol office where police informed suspect that they suspected him of committing a burglary, defendant was not in custody for Miranda purposes; "police officers are not required to administer Miranda warnings . . . simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect"); Flores v. Rivera, 06 Civ. 13517, 2009 WL 1110578 at *19 (S.D.N.Y. Apr. 23, 2009) (Swain, D.J.) (suspect who voluntarily sought out police and voluntarily accompanied them to precinct not in custody); Kollar v. Smith, 04 Civ. 10175, 2005 WL 1653883 at *7 (S.D.N.Y. July 12, 2005) (suspect voluntarily accompanied police to police station, was not restrained in any way, was informed he was free to leave, and left the

station once questioning was complete, was not in custody); <u>United States</u> v. <u>Al-Marri</u>, 230 F. Supp. 2d 535, 543 (S.D.N.Y. 2002) (suspect who voluntarily accompanied FBI agents to the FBI office in a casual manner and was interviewed in an unlocked interview room allowing suspect the chance to leave at any time, was not in custody); <u>White</u> v. <u>Keane</u>, 95 Civ. 10754, 1996 WL 527340 at *1 (S.D.N.Y. Sept. 16, 1996) (where "petitioner voluntarily accompanied the police officer to the station, never indicated that he wanted to leave and was allowed to go unescorted to the bathroom," petitioner was not in custody at the time statements were made).

The circumstances at the police station were not coercive. During his initial 4:00 a.m. interview, which lasted for fifteen to thirty minutes, Officer Flores told Colon that he was not under arrest and that he was free to leave. (<u>See</u> page 6 above.) About ninety minutes later, at 6:00 a.m., Detective Kane spoke to Colon for about fifteen minutes. (<u>See</u> pages 7 & 23 above.) Colon never was handcuffed. (<u>See</u> pages 6, 7, 10, 22 above.) Colon went to the bathroom without escort, and the door to the interview room was left open. (<u>See</u> pages 5, 6, 7, 10, 14 above.) It is therefore no surprise that, at the end of the pretrial suppression hearing, Colon's counsel conceded that Colon was not in custody through his 6:00 a.m. interview with Detective Kane. (<u>See</u> page 15 above.)

But Colon argues that, after a three and a half hour break in questioning, he suddenly came into custody during the 10:00 a.m. interview with Detective Mendez. (<u>See</u> pages 16 & 33 above.) This argument has no merit. Colon was repeatedly told by both Detective Mendez and Officer Flores during this interview that he was not under arrest and was free to leave. (<u>See</u> pages 10 & 24 above.) In fact, Colon replied that "he understood, he knew because he hadn't done anything." (<u>See</u> page 10 above.) <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Al-Marri</u>, 230 F. Supp. 2d at 543 <u>and</u>

White v. Keane, 1996 WL 527340 at *1, both described at page 70 above; United States v. Wallace, 178 Fed. Appx. at 79-80; Machicote v. Ercole, 2008 WL 169348 at *9; and Harris v. Woods, 2006 WL 1140888 at *26, all described at pages 53-54 above.

Detective Mendez's questions were not enough to transform the interview into a custodial interrogation. Admittedly, interrogation under Miranda refers not only to express questioning, but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 1689-90 (1980). A "question mark" is not required. Id., 446 U.S. at 301 n.6, 100 S. Ct. at 1690 n.6. "'Only questioning that reflects a measure of compulsion above and beyond that inherent in custody itself constitutes interrogation the fruits of which may be received in evidence only after Miranda warnings have been given. The questions asked must have been both likely to elicit an incriminating response and to produce psychological pressures that will subject the individual to the "will" of his examiner.'" United States v. Rodriguez, 356 F.3d 254, 258 (2d Cir. 2004) (quoting United States v. Morales, 834 F.2d 35, 38 (2d Cir. 1987)).

Detective Mendez became more "inquisitive" as the interview progressed, asking Colon to explain inconsistencies in his story. (See page 8 above.) Merely expressing disbelief or even informing an individual that he or she is a suspect does not necessarily amount to a custodial interrogation. Compare, e.g., Stansbury v. California, 511 U.S. 318, 320, 114 S. Ct. 1526, 1530 (1994) ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue. . . ."); and Vega v. Artuz, 97 Civ. 3775, 2002 WL 252764 at *10-11 (S.D.N.Y. Feb. 20, 2002) (where police confronted suspect for twenty to twenty-

five minutes at the police station with information about victim's injuries, expressed skepticism about his story, and told him to tell the truth and spare his innocent family grief, situation was not so coercive as to amount to a custodial interrogation); with Tankleff v. Senkowski, 135 F.3d at 244 (where petitioner was subjected to increasingly hostile questioning at the police station for two hours, during which the detectives had accused him of showing insufficient grief and that they could not accept his explanations, a reasonable person in petitioner's position would not have felt free to leave and should have been advised of his Miranda warnings). Detective Mendez's questions were not enough to transform the interview into a custodial interrogation. Detective Mendez remained "relaxed," "civil," and "reassuring" throughout the questioning. (See page 8 above.) Furthermore, the physical circumstances during Detective Mendez's 10:00 a.m. interview remained the same as earlier in the day: Colon still was not handcuffed or restrained in any manner and moved freely about the interview room, the door to which remained open. (See page 10 above.)

Detective Rivera's subsequent encounter with Colon supports the conclusion that Colon did not come into custody before Detective Mendez informed Colon of his Miranda rights at 11:45 a.m. At 10:45 a.m., Detective Rivera arrived at the precinct and saw Colon sitting alone in the interview room with the door open. (See page 10 above.) At 11:15 a.m., Colon left the interview room and had started to make a telephone call outside the room when he spotted Detective Rivera, who he knew, and called him over. (See page 10 above.) At this point, Colon was not subject to any restraint, much less the sort "associated with formal arrest." United States v. Newton, 369 F.3d 659, 671-72 (2d Cir.) (quotations omitted), cert. denied, 543 U.S. 947, 125 S. Ct. 371 (2004). But, even if Colon had been in custody, that would have been no ground to suppress his conversation with

Detective Rivera because it was Colon who initiated the conversation, volunteered why he was at the precinct, and asked Detective Rivera what was going on. (See pages 10-11 above.) Following this initial conversation with Detective Rivera, Detective Mendez resumed questioning Colon. (See page 11 above.) But Detective Mendez merely asked Colon to resolve inconsistencies in his statement, the same approach he had taken during the 10:00 a.m. interview. (See page 11 above.) Accordingly, there was no change in circumstances from a few minutes before, when Colon had walked freely into the squad room to use a telephone. (See pages 10-11 above.) Furthermore, as Colon conceded on direct appeal, through this point, he had not made an inculpatory statement. (See Dkt. No. 12: State Ans. App. Ex. B: Colon 1st Dep't Br. at 95.)

At 11:40 a.m., when Colon asked Detective Rivera if they could speak in private and then volunteered that he had had sex with Castano in her apartment, the statement was neither custodial, nor prompted by interrogation. (See pages 11-12, 25 above.) As the First Department observed, Colon "initiated" the conversation with Detective Rivera and therefore his admission was "not the product of custodial interrogation." (See pages 34-35 above.) Detective Rivera did not ask any questions or say anything to Colon; rather, Colon volunteered that he had had sex with Castano. (See pages 12, 25 above.) As the hearing court observed, while Colon apparently "felt obliged to . . . maintain his facade of innocence," his "subjective" view did not compel a finding of custody and a "reasonable person" would have still felt "free to leave" and would not have understood himself to be subjected to restraints comparable to those associated with formal arrest during the morning. (State Ans. App. Ex. A: 8/6/04 J. Kahn Decision at 63.) See United States v. Rommy, 506 F.3d 108, 132 (2d Cir. 2007) ("As Miranda itself recognized, . . . '[v]olunteered statements of any kind are not

barred by the Fifth Amendment' and, thus, do not require preliminary advice of rights. . . . 'There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make.' . . . [E]ven if a defendant has asserted his Fifth Amendment right to counsel, if the defendant 'himself initiates further communication' with law enforcement, 'nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial.'") (citations omitted), <u>cert. denied</u>, 128 S. Ct. 1681 (2008).

Based upon all the factors, singly and collectively, this Court holds that Justice Kahn's conclusion, affirmed by the First Department, that Colon's initial statements were not the result of custodial interrogation and thus <u>Miranda</u> warnings were not required, was not unreasonable based on the record evidence, nor was it an unreasonable application of <u>Miranda</u> and its progeny. Accordingly, not only Colon's initial un-<u>Mirandized</u> statement but also his subsequent <u>Mirandized</u> statements were properly admitted into evidence at trial.

**C.  Colon's Subsequent <u>Mirandized</u> Statements Were Voluntary and Admissible Even If Colon's Initial Un-<u>Mirandized</u> Statements Were Made in a Custodial Interrogation**

Even if Colon's initial pre-<u>Miranda</u> statements were found to be in violation of <u>Miranda</u> (contrary to the state courts' and this Court's determination), the Court would need to determine whether the circumstances surrounding Colon's initial statement "were so coercive as to prevent him from making a subsequent knowing and voluntary waiver of his rights, thereby requiring

the suppression of his" subsequent <u>Mirandized</u> statements. <u>Tankleff</u> v. <u>Senkowski</u>, 135 F.3d 235, 244 (2d Cir. 1998); <u>see also</u>, <u>e.g.</u>, <u>Colorado</u> v. <u>Connelly</u>, 479 U.S. 157, 167, 107 S. Ct. 515, 522 (1986) ("coercive police activity is a necessary predicate to the finding that a [post-<u>Miranda</u>] confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d 175, 183 (2d Cir.) ("[W]e must consider whether the circumstances surrounding petitioner's unwarned confessions were so coercive as to prevent him from making a subsequent knowing and voluntary waiver of his rights, thereby requiring the suppression of his post-<u>Miranda</u> confession."), <u>cert. denied</u>, 540 U.S. 1091, 124 S. Ct. 962 (2003); <u>Casellas</u> v. <u>McGinnis</u>, No. 99-2127, 199 F.3d 1321 (table), 1999 WL 980948 at *2 (2d Cir. Oct. 22, 1999) (Defendant's subsequent statements "can be suppressed on <u>Miranda</u> grounds only if the circumstances surrounding the first confession were sufficiently coercive so that the defendant could not have been said to have knowingly and intelligently waived his rights with respect to these subsequent admissions."), <u>cert. denied</u>, 529 U.S. 1091, 120 S. Ct. 1729 (2000); <u>United States</u> v. <u>Orellana-Osorio</u>, No. 95-1541, 101 F.3d 1393 (table), 1996 WL 460797 at *2 (2d Cir. Aug. 14, 1996) ("When an unwarned admission has been made without coercion, the admissibility of additional statements, made after the subsequent administration of <u>Miranda</u> warnings, turns on whether these latter statements were also freely given."), <u>cert. denied</u>, 519 U.S. 1069, 117 S. Ct. 713 (1997).[32]

---

[32] See also, <u>e.g.</u>, <u>United States</u> v. <u>Troche</u>, 181 F. Supp. 2d 340, 350 (S.D.N.Y. 2002) ("Unless 'the circumstances surrounding [the defendant's] first unwarned confession were so coercive (continued...)

Even assuming arguendo that Colon was "in custody" (which this Court agrees with the state courts that he was not), custody alone is not sufficient to prove coercion. "Serious pressures inherent in custodial interrogation will inevitably be present in any case under [Oregon v.] Elstad – which, after all, addresses situations in which a defendant was in custody and entitled to Miranda warnings at some point before those warnings were given. Thus, we cannot rely solely on the Miranda presumption that custodial interrogation is coercive in determining whether [petitioner's] second confession must be suppressed." Tankleff v. Senkowski, 135 F.3d at 244; accord, e.g., Parsad v. Greiner, 337 F.3d at 183; Legree v. Greiner, 00 Civ. 6680, 2001 WL 527423 at *8 (S.D.N.Y. May 17, 2001) (Peck, M.J.), report & rec. adopted, 2001 WL 1231535 (S.D.N.Y. Oct. 16, 2001).

The Court must look at the "totality of the circumstances" to determine if the circumstances surrounding Colon's initial statements were so coercive as to require suppression of his post-Miranda statements. See, e.g., Parsad v. Greiner, 337 F.3d at 183 ("in determining the voluntariness of petitioner's post-Miranda confessions, we must examine the totality of the circumstances"); Casellas v. McGinnis, 1999 WL 980948 at *2; Tankleff v. Senkowski, 135 F.3d

---

32/ (...continued)
as to prevent him from making a subsequent knowing and voluntary waiver of his rights,' the second warned confession will be admissible.") (quoting Tankleff v. Senkowski, 135 F.3d at 244, internal quotations omitted); Heron v. People, 98 Civ. 7941, 1999 WL 1125059 at *8 (S.D.N.Y. Dec. 8, 1999) ("In determining voluntariness, this Court must consider whether the circumstances surrounding petitioner's 'first' unwarned statements were so coercive as to prevent him from making a subsequent knowing and voluntary waiver of his rights, thereby requiring the suppression of his 'second' warned statement . . . [T]his Court must look to the totality of the circumstances.").

at 244-45 (citing <u>Campaneria</u> v. <u>Reid</u>, 891 F.2d 1014, 1019-20 (2d Cir. 1989), <u>cert. denied</u>, 499 U.S. 949, 111 S. Ct. 1419 (1991)); <u>United States</u> v. <u>Orellana-Osorio</u>, 1996 WL 460797 at *2; <u>United States</u> v. <u>Valdez</u>, 16 F.3d 1324, 1328 (2d Cir.) ("Under standard voluntariness analysis, [the Court must] inquire 'into all the circumstances surrounding the law enforcement officials' conduct to ascertain whether it overcame the accused's will to resist and brought about a confession that was not freely self-determined.'"), <u>cert. denied</u>, 513 U.S. 810, 115 S. Ct. 60 (1994); <u>United States</u> v. <u>Valencia</u>, 826 F.2d 169, 177 (2d Cir. 1987); <u>Heron</u> v. <u>People</u>, 1999 WL 1125059 at *8; <u>Vasquez</u> v. <u>Senkowski</u>, 54 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999); <u>United States</u> v. <u>Ford</u>, 96 Cr. 672, 1997 WL 538813 at *11 (S.D.N.Y. Aug. 29, 1997).

   The Second Circuit has emphasized the "fact-specific nature" of the "totality of the circumstances" determination. <u>Tankleff</u> v. <u>Senkowski</u>, 135 F.3d at 245.[33/] The Court must "look to <u>Miranda</u>'s twin rationales - trustworthiness and deterrence - to see whether suppression of the second statement would serve the general goal of deterring unlawful police conduct and the Fifth Amendment goal of assuring the receipt of trustworthy evidence." <u>Tankleff</u> v. <u>Senkowski</u>, 135 F.3d at 245 (internal quotations omitted); <u>accord</u>, <u>e.g.</u>, <u>Legree</u> v. <u>Greiner</u>, 2001 WL 527423 at *9. "In applying the totality of the circumstances test, the pertinent factors which merit consideration are (1) the characteristics of the accused, (2) the conditions of [the] interrogation, and (3) the conduct of

---

[33/]  Accord, <u>e.g.</u>, <u>Legree</u> v. <u>Greiner</u>, 2001 WL 527423 at *9; <u>see also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Gilmore</u>, No. 99-1084, 205 F.3d 1325 (table), 1999 WL 1253987 at *1 (2d Cir. Dec. 15, 1999) ("We have previously stressed the 'fact-specific nature' of these sorts of determinations. . . .").

[the] law enforcement officials. In connection with the third factor, whether a suspect has been advised of his rights under <u>Miranda</u> is an important consideration in determining whether a confession is voluntary." <u>Vasquez</u> v. <u>Senkowski</u>, 54 F. Supp. 2d at 215 (citations & quotations omitted); <u>accord, e.g., Dickerson</u> v. <u>United States</u>, 530 U.S. 428, 434, 120 S. Ct. 2326, 2332 (2000) (The test to determine whether a statement is voluntary is "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession. The due process test takes into consideration 'the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation.'"); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 183; <u>United States</u> v. <u>Anderson</u>, 929 F.2d 96, 99-100 (2d Cir. 1991); <u>United States</u> v. <u>Tutino</u>, 883 F.2d 1125, 1138 (2d Cir. 1989) ("The test of voluntariness of a confession is whether all the relevant circumstances show that the conduct of law enforcement officials 'was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined."), <u>cert. denied</u>, 493 U.S. 1081, 110 S. Ct. 1139 (1990); <u>Green</u> v. <u>Scully</u>, 850 F.2d 894, 901-02 (2d Cir.) (citing cases), <u>cert. denied</u>, 488 U.S. 945, 109 S. Ct. 374 (1988).[34]

---

[34] See also, e.g., <u>Wilson</u> v. <u>Walker</u>, No. 00-CV-5348, 2001 WL 1388299 at *4 (E.D.N.Y. Nov. 2, 2001) ("[T]he totality of the circumstances [for purposes of <u>Oregon</u> v. <u>Elstad</u>] includ[es] the characteristics of the accused, the conditions of the interrogation, and the conduct of the law enforcement officials."); <u>Legree</u> v. <u>Greiner</u>, 2001 WL 527423 at *9; <u>Heron</u> v. <u>People</u>, 1999 WL 1125059 at *8; <u>United States</u> v. <u>Zerbo</u>, 98 Cr. 1344, 1999 WL 804129 at *8 (S.D.N.Y. Oct. 8, 1999); <u>United States</u> v. <u>Ford</u>, 1997 WL 538813 at *10-11; <u>United States</u> v. <u>Rodriguez</u>, 92 Cr. 452, 1993 WL 78060 at *2 (S.D.N.Y. Mar. 16, 1993) ("A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given. Whether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, (continued...)

The Second Circuit has further explained the three factors in the "totality of the circumstances."  First, "[t]he relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence." Green v. Scully, 850 F.2d at 902.  Second, the conditions of interrogation include "the place where an interrogation is held," "the length of detention" and "the presence or absence of counsel." Green v. Scully, 850 F.2d at 902.  Third, the conduct of law enforcement officials includes consideration of :

> the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights, whether there was physical mistreatment such as beatings, or long restraint in handcuffs, and whether other physical deprivations occurred such as depriving an accused of food, water or sleep, or even of clothing, for a prolonged period. In

---

34/    (...continued)
including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials.").

The Second Circuit has upheld the admission of post-Miranda confessions obtained after inculpatory pre-Miranda statements in cases which present more compelling facts for petitioner.  See, e.g., Nova v. Bartlett, 211 F.3d 705, 707-10 (2d Cir. 2000) (petitioner "gave two extensive confessions after voluntarily waiving his Miranda rights, and those confessions were admissible at trial," even though, before receiving Miranda warnings, "police employed several tactics to induce [petitioner] to make statements implicating himself in the crime" and did not give petitioner "an opportunity to contact a lawyer, friend, or family member."); cf. Casellas v. McGinnis, 1999 WL 980948 at *1-3 (post-Miranda statements admitted even though pre-Miranda statements were obtained after police grabbed the arm of extremely religious defendant and forced him to swear on a cross which the police untruthfully represented had been blessed by the Pope); Tankleff v. Senkowski, 135 F.2d at 240-41, 244-45 (upholding the admission of petitioner's second counseled statement where the petitioner's first statements occurred before he was advised of his Miranda rights but after the police interrogated him, and told him untruthfully, that his victim regained consciousness and accused him of the crime).

addition . . . such police conduct might include psychologically coercive techniques such as brainwashing or promises of leniency or other benefits.

Green v. Scully, 850 F. 2d at 902 (citations omitted).

Applying these factors to the record, the Court agrees with Justice Kahn and the First Department that the circumstances surrounding petitioner's pre-Miranda statements were not so coercive as to render petitioner's subsequent post-Miranda statements involuntary. "The record provides no indication that the initial interrogation of petitioner involved physical or psychological coercion," with respect to the interrogation after the homicide. Heron v. People, 1999 WL 1125059 at *8; see also, e.g., Legree v. Greiner, 2001 WL 527423 at *9; Vasquez v. Senkowski, 54 F. Supp. 2d at 215. Colon was not an inexperienced youth, but a man in his sixties with experience from a prior arrest. (See pages 12, 26 above.)

While Colon was interviewed during the early morning hours, this was not a case where the police intentionally kept a suspect awake for long periods so that he would be more easily manipulated into confessing. There is no suggestion that Colon felt any fatigue or expressed a desire to end the interview or sleep. (See pages 6-15, 22-28 above.) See, e.g., United States v. Guzman, 11 F. Supp. 2d 292, 298 (S.D.N.Y.) (petitioner's suggestion that he was coerced by sleep deprivation rejected where no evidence "to suggest that [petitioner] expressed any fatigue he felt, or that he indicated a desire to end the interrogation.") (& cases cited therein), aff'd, 152 F.3d 921 (2d Cir. 1998); United States v. DiLorenzo, 94 Cr. 303, 1995 WL 366377 at *8 (S.D.N.Y. June 19, 1995) ("[A] claim that a defendant was exhausted or suffering from the effects of alcohol is not, in the absence of coercive law enforcement activity, sufficient to characterize his confession as

involuntary.") (& cases cited therein.); <u>cf.</u> <u>United States</u> v. <u>Ortiz</u>, 99 Cr. 532, 1999 WL 1095592 at

*3 (S.D.N.Y. Dec. 3, 1999) (Voluntariness claim failed for lack of "coercive police activity" where

defendant alleged that "the effects of heroin withdrawal" prevented him from knowingly and

voluntarily waiving his <u>Miranda</u> rights and that he had "informed the police of his 'condition.'").

There is no credible evidence that the detectives were hostile or abusive or that Colon asked for the

interrogation to stop or requested an attorney. (<u>See</u> pages 6-15, 22-28 above.) Colon was not

handcuffed, the interview room door was open, and he went to the bathroom alone and left the

interview room to make a phone call. (<u>See</u> pages 5, 6, 7, 10, 14, 22 above.) The police told Colon

he was not under arrest and he was free to leave. (<u>See</u> pages 6, 10, 24 above.) Colon was given food

and something to drink. (<u>See</u> page 10 above.) All evidence indicates that Colon was talking

voluntarily to the officers. Thus, the police conduct was not coercive. <u>See</u>, <u>e.g.</u>, <u>Legree</u> v. <u>Greiner</u>,

2001 WL 527423 at *9; <u>United States</u> v. <u>Gilmore</u>, 1999 WL 1253987 at *1 (despite initial unwarned

statement, subsequent statement was knowing and voluntary where "'questioning proceeded without

coercion, threats, [or] any show of force'"); <u>Vasquez</u> v. <u>Senkowski</u>, 54 F. Supp. 2d at 216 (police

conduct "not coercive" where police were not abusive toward petitioner and merely reiterated what

petitioner said before he was advised of his rights).

   The pre-<u>Miranda</u> questioning was reasonable in length: although Colon was in the

precinct for approximately eight hours before receiving <u>Miranda</u> warnings, he was questioned as a

witness not a suspect, and there were long gaps where he was not questioned. (<u>See</u> pages 5-12, 22-

25 above.) Colon's statement to Detective Rivera was not prompted by any of the officers' questions,

and it occurred outside of the interview room at Colon's request.  (See pages 10-12, 24-25 above.)
Detective Rivera then immediately told Colon to stop and Detective Mendez immediately gave
Colon Miranda warnings.  (See pages 12, 25 above.)  The atmosphere and questioning were not
coercive.

        The detectives did not use dishonesty or misrepresentation to elicit any statements
from Colon about the events surrounding Castano's death.  Rather, they simply asked Colon to tell
the truth about what he knew regarding Castano.  (See pages 11, 12, 24 above.)  Compare, e.g.,
United States v. Anderson, 929 F.2d at 98-103 (post-Miranda confession suppressed because "the
agent told defendant that if he asked for a lawyer it would permanently preclude him from
cooperating with the police."); United States v. Zerbo, 1999 WL 804129 at *2-14 (agents isolated
low intelligence, mentally ill defendant from his family); with, e.g., Legree v. Greiner, 2001 WL
527423 at *9 ("The detectives did not use dishonesty or misrepresentation to elicit statements from
[petitioner]."); United States v. Ford, 1997 WL 538813 at *10 ("No psychologically coercive tactics
were used . . . .").

        As soon as Colon said that he "had sex" with "the lady" in her apartment, Detective
Rivera told Colon to tell the truth and brought him to the interview room, where Detective Mendez
read Colon Miranda warnings.  (See pages 12, 25 above.)  While the passage of time from the
unwarned statement to Colon's first post-Miranda warnings statement was short, so was the prior
statement, i.e., the cat was not really out of the bag.  Moreover, when Colon was Mirandized, he
stated that he understood each warning, initialed each written warning on the Miranda card, said that

he was willing to answer questions and initialed that line on the Miranda card as well. (See page 12 above.) In addition, Colon told Detective Mendez that he knew about his Miranda rights because he had been arrested before. (See page 12 above.) Nothing in the record indicates that Colon did not knowingly waive his Miranda rights.

Furthermore, Colon's videotaped confession was taken by an assistant district attorney, not the detectives, eight hours after Detective Mendez first read Colon his Miranda rights. (See pages 14-15, 26-28 above.) See, e.g., Vasquez v. Senkowski, 54 F. Supp. 2d at 217-18 (Videotaped confession was voluntary where petitioner had already received and waived Miranda rights three times, the assistant district attorney, rather than the detectives, conducted the taped interview at a different station house approximately sixteen hours after petitioner's initial interview with detectives.); Pabon v. Hake, 763 F. Supp. 1189, 1191, 1194 (E.D.N.Y. 1991) (Videotaped statement was voluntary where it was petitioner's third statement, taken eight hours after petitioner's second statement, and was taken by a different person, an assistant district attorney.); McIntyre v. Scully, No. 89 C 903, 1989 WL 69893 at *3 (E.D.N.Y. June 19, 1989) ("Since [petitioner's] first, unwarned confession was not coerced, there was no constitutional reason to exclude the third, videotaped confession. Petitioner made that statement over three hours later after having twice received Miranda warnings and twice waived his rights. An assistant district attorney who had not heard the earlier admissions conducted the interrogation, although the police detective who took down the written confession was also present. This break in the interrogation and change in personnel, coupled with reiteration of the warnings and waiver, suffice to remove the taint of the

unwarned statement. By then petitioner knew that he was free to speak or to remain silent. Having chosen to speak, he must live with the consequences of his choice.").

Therefore, "'in view of the totality of the circumstances, the detectives' conduct was entirely appropriate, and, indeed, there is nothing in the record to support a finding that the detectives' conduct prevented petitioner from freely and intelligently waiving his rights and agreeing to speak to the detectives' upon being given Miranda warnings." Legree v. Greiner, 2001 WL 527423 at *9 (quoting Vasquez v. Senkowski, 54 F. Supp. 2d at 215-16) (conditions surrounding interrogation not coercive where petitioner voluntarily accompanied the police to the station house from his apartment, was not handcuffed, questioning "did not last long" and "the conduct of the detectives conducting the questioning of petitioner was not coercive" or abusive); see also, e.g., Parsad v. Greiner, 337 F.3d at 184 (where room was unlocked throughout the interrogation, suspect was not handcuffed prior to his actual arrest, suspect was questioned intermittently for almost four hours before incriminating statement, and there was no evidence of physical abuse of the petitioner, petitioner's pre-Miranda statements were not coerced); Nova v. Bartlett, 211 F.3d at 709 (There has been no "evidence presented to indicate that the questioning of [petitioner] was coercive or that his statements were otherwise involuntary. His later, fully warned confessions were therefore admissible."); Diaz v. Senkowski, 76 F.3d 61, 63, 65 (2d Cir. 1996) (Totality of the circumstances indicated petitioner's statements were voluntary where "(1) [petitioner] was legally an adult; (2) there was no evidence that [petitioner] had below-average intelligence; (3) there was no evidence that [petitioner] was denied food, access to the bathroom, or sleep during his [station house]

interrogation; (4) [petitioner] was not beaten, otherwise abused, or even handcuffed; (5) the [four-hour] duration of the interrogation did not by itself establish that the statement was involuntary; and (6) '[t]he threat of speaking to [petitioner's grandmother] is not the type of coercion that, without more, would overbear a normal person's will and cause [him] to confess involuntarily . . .'"); Holland v. Donnelly, 216 F. Supp. 2d 227, 231-34 (S.D.N.Y. 2002) (no coercion where petitioner voluntarily accompanied officers to police headquarters, never asked to leave, was not told by the police that he was or was not free to leave, spent the night at headquarters "sleeping in his chair at least some of that time," was twice offered food and drink in over 19 hours, was allowed to use the bathroom, was questioned not continuously but on four separate occasions.), aff'd, 324 F.3d 99 (2d Cir.), cert. denied, 540 U.S. 834, 124 S. Ct. 86 (2003); Wilson v. Walker, 2001 WL 1388299 at *4 (Post-Miranda statements admissible where petitioner was questioned for seven continuous hours but "was never told that he could not leave"; "was allowed to go to the bathroom unattended and was given food and drink"; "questioning . . . was not overly aggressive and did not employ trickery or deceit"; "nothing about [petitioner's] individual characteristics . . . made him particularly vulnerable to police interrogation"; and "there is no indication that [petitioner] did not understand his rights once he was given the [Miranda] warnings or that his waiver was not knowing and voluntary."); Richter v. Artuz, 77 F. Supp. 2d 385, 396 (S.D.N.Y. 1999) (Parker, D.J.) (No coercion found where petitioner was "present at the police barracks for a considerable amount of time, [but] was questioned only intermittently and not continuously . . . was offered and refused food and drink . . . . [and] did not express his desire to leave . . . [or] to speak with an attorney.").

Colon has failed to demonstrate that the "totality of the circumstances" rendered the Miranda warnings ineffective. Colon's post-Miranda written and videotaped confessions were properly admitted at his trial (and thus admission of his pre-Miranda statements at worst would be harmless error).

**D. The Circumstances of Colon's Pre and Post-Warnings Statements Are Distinguishable from the Circumstances of Missouri v. Seibert**[35/]

---

[35/] Colon was convicted and sentenced on April 22, 2004 (Dkt. No. 2: Petition ["Pet."] ¶¶ 1-5) and on September 23, 2008, the First Department affirmed Colon's conviction on direct appeal, People v. Colon, 54 A.D.3d 621, 864 N.Y.S.2d 14 (1st Dep't), appeal denied, 11 N.Y.3d 923, 874 N.Y.S.2d 9 (2009). On June 28, 2004, in between the New York Supreme Court's and the First Department's decisions, the United States Supreme Court decided Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601 (2004). Seibert was decided after Colon's conviction but before his direct appeal briefs, and yet he never invoked the holding on appeal. (See Dkt. Nos. 12-13: State Ans. & Appx. Ex. B: 2/07 Colon 1st Dep't Br., & Ex. D: 8/08 Colon 1st Dep't Reply Br.) Colon never challenged the voluntariness of either of his Miranda waivers. It remains an open question whether Missouri v. Seibert should be viewed as clearly established federal law for the purposes of Colon's habeas petition. As explained by the Second Circuit in Brown v. Greiner:

> The Supreme Court has provided inconsistent guidance on the precise time to which a federal court should look to assess what was "clearly established Federal law, as determined by the Supreme Court." In Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), Justice Stevens, writing for a majority of the court, stated: "The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." Id. at 390, 120 S. Ct. 1495 (Stevens, J., for the court) (emphasis added). In a separate opinion, Justice O'Connor, also writing for a majority of the court, stated that the phrase "clearly established Federal law, as determined by the Supreme Court" refers "to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." Id. at 412, 120 S. Ct. 1495 (O'Connor, J., for the court) (emphasis added).

Brown v. Greiner, 409 F.3d 523, 533 n.3 (2d Cir. 2005) (emphasis in original), cert. denied, 547 U.S. 1022, 126 S. Ct. 1566 (2006). This Court assumes, without deciding, that Missouri
(continued...)

As discussed (see Point II.A.2 above), in Missouri v. Seibert the Supreme Court held that the "question-first" police interrogation technique, by which police intentionally elicit a complete and detailed pre-warning confession, then subsequently administer Miranda warnings to obtain the identical confession, overcame the waiver and violated the suspect's Fifth Amendment rights. Missouri v. Seibert, 542 U.S. 600, 604, 611, 124 S. Ct. 2601, 2605, 2610 (2004). In Seibert, before administering Miranda warnings, the police elicited a complete and detailed confession, at which point "there was little, if anything, of incriminating potential left unsaid." Id. at 616, 124 S. Ct. at 2612.

The facts surrounding Colon's statements are greatly dissimilar. Colon's initial statement that he "had sex" with "the lady" in her apartment was not coerced. (See pages 12 & 25 above.) While the police questioned Colon at length about his recent activities, Officer Flores repeatedly told Colon that he was not under arrest and that he was free to leave and Colon "said he understood, he knew because he hadn't done anything. . . ." (See pages 6, 10, 24 above.) After Colon volunteered to Detective Rivera that he had had sex with Castano in her apartment, rather than attempt to learn all the details as in Seibert, Detective Rivera told Colon to stop talking, that he should tell the truth, and took Colon back to the interview room, where Detective Mendez immediately read Colon the Miranda warnings. (See pages 12, 25 above.) Detective Mendez ensured that Colon understood his rights, which Colon knowingly and voluntarily waived. (See

---

35/     (...continued)
        v. Seibert is included in clearly established federal law for purposes of Colon's habeas petition, since it came down before the First Department's decision on his appeal.

pages 12, 25 above.) After reading Colon his <u>Miranda</u> warnings and listening to Colon's subsequent statement, Detective Mendez wrote a summary of Colon's statement and asked Colon if he wanted to make any changes.  (<u>See</u> pages 13, 25 above.)

The Court concludes that the detectives did not use the deliberate two-step interrogation technique forbidden by <u>Seibert</u>, and moreover, Colon's volunteered initial statement – that he "had sex" with "the lady" in her apartment– was not detailed enough, nor elicited in such a way, as to make a subsequent waiver ineffective.  Colon made a knowing and voluntary waiver of his <u>Miranda</u> rights before his confessions.  Admission of Colon's <u>Mirandized</u> statements was proper not only under <u>Elstad</u> but even under <u>Seibert</u> (and since the substance of Colon's non-<u>Mirandized</u> statement that he had had sex with Castano was included in his later, <u>Mirandized</u> statements, admission of the former would be harmless error even if that statement was found to be the result of custodial interrogation).

## III.  THE TRIAL COURT PROPERLY DECLINED COLON'S JURY CHARGE REQUESTS

Colon contends that Justice Kahn erred in refusing to "instruct the jury that [Colon's] post <u>Miranda</u> statement should be disregarded."  (<u>See</u> page 1 above.)  Presumably, Colon means to argue, as he did on direct appeal, that Justice Kahn should have instructed the jury to consider whether his "post-<u>Miranda</u> inculpatory statements," in particular his videotaped statement, were "part of a single chain of custodial interrogation."  (Dkt. No. 12: State Ans. App. Ex. B: Colon 1st Dep't Br. at 98.)  Colon further protested on direct appeal that Justice Kahn did not deliver the "general instructions" regarding the "traditional" voluntariness of statements contained in the New York

pattern jury instructions, again with particular regard to Colon's videotaped statement. (See page 34 above; Colon 1st Dep't Br. at 111.)

**A.** **No Federal Constitutional Right to a Jury Determination Regarding Statement Voluntariness**

The United States Constitution does not give a criminal defendant the right to a jury determination regarding statement voluntariness. See, e.g., Lego v. Twomey, 404 U.S. 477, 490, 92 S. Ct. 619, 627 (1972) (Supreme Court precedent "did not purport to change the normal rule that the admissability of evidence is a question for the court rather than the jury. Nor did that decision require that both a judge and jury pass upon the admissability of evidence when constitutional grounds are asserted for excluding it. We are not disposed to impose as a constitutional requirement a procedure we have found wanting merely to afford petitioner a second forum for litigating his claim."); United States v. Anderson, 394 F.2d 743, 747 (2d Cir. 1968)(finding no constitutional requirement of a jury determination of voluntariness); Rodriguez v. Artuz, 99 Civ. 9752, 2002 WL 31093605 at *7 (S.D.N.Y. Sept. 18, 2002) ("[T]he federal Constitution mandates only that the defendant receive a 'fair hearing and a reliable determination on the issue of voluntariness' by a judge prior to the confession's admission at trial. Once the judge has determined that the admissions were voluntarily made, there is 'no constitutional requirement . . . for a further submission to the jury.'") (citations omitted).

New York provides a statutory right allowing a defendant to argue to a jury that a statement should be disregarded as "involuntarily made within the meaning" of C.P.L. § 60.45. See C.P.L. § 710.70(3). C.P.L. § 60.45 bars admission of statements obtained by "any person" using

force, the threat of force, or undue pressure, or obtained by law enforcement through an inducement creating a "substantial risk" of false incrimination or in violation of a petitioner's rights "derive[d] from the constitution of this state or of the United States."

Before any issue as to statement voluntariness is submitted to the jury, however, sufficient evidence must be adduced at trial to create a factual dispute about the voluntariness of the statements. The First Department here found that "the trial evidence did not raise an issue of fact for the jury as to whether the videotaped statement was voluntarily given after a clear break in questioning." People v. Colon, 54 A.D.3d 621, 622-23, 864 N.Y.S.2d 14, 15 (1st Dep't 2008).

There was no factual question over what occurred in the seven-hour break in questioning. Rather, at issue in this case was only whether the period represented a "pronounced break" between Colon's statement to Detective Mendez between 11:45 a.m. and 1:20 p.m. and his 8:00 p.m. videotaped statement to ADA Hobbs. But, as at the suppression hearing, all of the trial evidence established that there had been a "clear break" in questioning. Foremost, Colon enjoyed a nearly seven-hour respite from questioning prior to the commencement of the videotaped interview. (See pages 13-14, 25-26 above.) And, before questioning re-commenced at 8:05 p.m., Colon was again informed of and waived his Miranda rights. (See pages 14, 26 above.) Accordingly, there was no colorable basis to instruct the jury to consider whether there had been "continuous interrogation."

Colon presented no evidence that tended to establish that he had been subjected to interrogation during the seven hours between his written and videotaped statements. On direct appeal, Colon attempted to avoid the fact that no one questioned him for seven hours by arguing that

Colon himself "repeatedly questioned" Detective Mendez about his prospects for probation.  (See page 34 above.)  Colon also struck upon the vague complaint that he remained "in the custody of the same interrogators."  (See page 34 above.)  In fact, though, there was a change in interviewers for the videotaped statement which, in conjunction with several hours respite and other factors, lead ineluctably to the conclusion that there was a pronounced break in questioning.  Accordingly, Justice Kahn was entirely correct not to instruct the jury on continuous interrogation in the absence both of legal authority to do so and of any proof that Colon was actually subjected to any interrogation at all throughout the afternoon of April 26, 2002.  In any event, any error would be only a matter of state law, not cognizable on habeas review.

**B.	Justice Kahn Was Correct Not to Charge the Jury to Consider Whether Colon's Videotaped Statement Was Coerced**

Justice Kahn also was entirely correct not to charge the jury to consider whether Colon's videotaped statement was coerced.  There was nothing in the record to support any inference that Colon was subjected to physical force or the threat of it.  There was no evidence of any police "trickery" used on Colon, and he was promised nothing in exchange for a statement.  In fact, the only "pressure" applied by law enforcement during the interviews were straightforward requests for Colon to tell the truth.  (See pages 9, 11, 12, 25 above.)  These hardly threatened to overwhelm Colon's will.  Moreover, at the outset of Colon's videotaped statement, he acknowledged that he had spoken to Detective Mendez "freely" and "voluntarily," then again waived his Miranda rights and agreed to answer ADA Hobbs' questions.  (See pages 5, 14 above.)  Significantly, neither at trial nor on direct appeal, did Colon ever explain how those knowing, voluntary waivers were supposedly followed

immediately by coerced statements. Thus, the First Department correctly concluded that "the trial evidence did not raise an issue of fact for the jury as to whether the videotaped statement was voluntarily given." People v. Colon, 54 A.D.3d at 622-23, 864 N.Y.S.2d at 14.

Indeed, the circumstances under which Colon requested a charge based on "trickery" underscored the lack of any reasonable basis to deliver such an instruction. Most conspicuously, when Justice Kahn asked for a record basis to support Colon's request, Colon's counsel claimed that the police had promised Colon probation in exchange for a statement. But, as Justice Kahn recognized, that contention was false; the evidence at trial was that, in response to Colon's questions about a possible sentence, Detective Mendez told Colon that a judge would determine his sentence. (See pages 25, 31-32 above.)

The only factual basis defense counsel mentioned even tangentially in connection with his request for an instruction on traditional voluntariness was that Colon was purportedly denied his blood pressure medication. Of course, counsel alluded to that possible theory only after Justice Kahn had made her ruling, when counsel mentioned "denied medication" as a ground he "would argue." (Tr. 3163.) In any event, Colon's claim that he was denied medication has no basis in the record. Rather, while early in the day on April 26th, Colon told police officers that he took blood pressure medication, he also assured officers that he was feeling fine and did not need his medication, which officers nonetheless retrieved for him. (See pages 12-13 above.) When Colon asked for his medication during the videotaped statement, the interview was immediately suspended and the medication provided. (See pages 15, 27 above.) Moreover, once questioning was suspended, Colon had no more complaints about his health and, instead, started asking Detective

Mendez for feedback on the course of the videotaped statement. (See pages 15, 27 above.) In short, any suggestion that Colon felt he needed to provide a statement in order to get his medicine was unfounded.

In sum, the state courts correctly held as a matter of state law that Colon was not entitled to a jury instruction on traditional voluntariness.

## **CONCLUSION**

For the reasons set forth above, Colon's habeas petition should be <u>DENIED</u> in its entirety and a certificate of appealability should not be issued.

## **FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6.[36/] Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain, 500 Pearl Street, Room 755, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Swain (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86

---

[36/] If the pro se petitioner requires copies of any of the cases reported only in Westlaw, petitioner should request copies from defense counsel. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.1(c)

(1994); <u>Roldan</u> v. <u>Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298, 300 (2d

Cir.), <u>cert. denied</u>, 506 U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Sec'y of Health & Human Servs.</u>,

892 F.2d 15, 16 (2d Cir. 1989); <u>Wesolek</u> v. <u>Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988);

<u>McCarthy</u> v. <u>Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72.

Dated:      New York, New York
            January 4, 2010

                                        Respectfully submitted,


                                        _____
                                        **Andrew J. Peck**
                                        United States Magistrate Judge

Copies to:  Rafael Juan Colon
            A.D.A. Christopher P. Marinelli, Esq.
            Judge Laura Taylor Swain